# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

LAURA SAAVEDRA FORERO,           )
                                 )
            Plaintiff,           )
                                 )
      v.                         )          1:24CV930
                                 )
UNIVERSITY OF NORTH CAROLINA AT  )
CHAPEL HILL POLICE DEPARTMENT,   )
et al.,                          )
                                 )
            Defendants.          )

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned Magistrate Judge for a recommended ruling on Defendants' Motion to Dismiss Plaintiff's Second Amended Complaint (Docket Entry 25 ("Dismissal Motion")). (See Docket Entry dated June 26, 2025 (referring Dismissal Motion).) For reasons that follow, the Court should grant in part and should deny in part the Dismissal Motion, by dismissing most of Plaintiff's claims against most Defendants but allowing a few claims to proceed against certain Defendants.

## INTRODUCTION

Plaintiff's Second Amended Complaint ("SAC") asserts these eight claims for relief:

1) "a claim pursuant to 42 U.S.C. § 1983 for violation of the right to be free from unreasonable searches under the Fourth Amendment" (Docket Entry 20 at 15), brought "[a]gainst Defendant [University of North Carolina at Chapel Hill Police Department

("UNC-CH")[1]] and Defendants [Forest Wade] Humphrey, [Matthew] Dobson, and [Jeffrey] Davis in both their official and individual capacities" (id. (bold font and italics omitted));

2) a Section 1983 claim for "violat[ion of Plaintiff's Fourth Amendment] right to be free from excessive force" (id. at 26; see also id. at 25 (identifying Section 1983 and Fourth Amendment as bases for second claim)), brought "[a]gainst Defendants Humphrey, Dodson, and Davis in their individual capacities" (id. at 25 (bold font and italics omitted));

3) a claim for "violation of the Americans with Disabilities Act" (id. at 27 (all-caps, bold, and enlarged font omitted)), brought "[a]gainst Defendant UNC[-]CH and Defendants Humphrey, Dodson, and Davis in their official capacities" (id. (bold font and italics omitted));

4) a claim for "violation of Section 504 of the Rehabilitation Act" (id. at 31 (all-caps, bold, and enlarged font omitted)), brought "[a]gainst Defendant UNC[-]CH and Defendants Humphrey,

---

[1] "North Carolina courts hold that police departments do not have the capacity to sue or be sued." Ridge v. City of Randleman, No. 1:07CV966, 2007 WL 9754548, at *4 (M.D.N.C. Aug. 17, 2007) (unpublished) (Dixon, M.J.) (collecting cases), recommendation adopted, 2008 WL 11487925 (M.D.N.C. June 13, 2008) (unpublished) (Beaty, C.J.); see also, e.g., Ellison v. Elledge, No. 3:10CV157, 2010 WL 1506904, at *1 (W.D.N.C. Apr. 14, 2010) (unpublished) ("Rule 17(b) of the Federal Rules of Civil Procedure states that a party's (other than an individual['s] or corporation['s]) capacity to be sued is determined by the law of the state in which the [d]istrict [c]ourt is held.  Under North Carolina law unless a statute provides to the contrary, only persons in being may be sued. In North Carolina, there is no statute authorizing suit against a police department." (internal citation omitted)).  Defendants, however, have assumed that Plaintiff "intend[ed] to bring [her] claim[s] against UNC-CH instead." (Docket Entry 26 at 1.)  This Recommendation will do the same.

Dodson, and Davis in their official capacities" (id. (bold font and italics omitted));

5) a Section 1983 claim for "retaliation in violation of the First Amendment" (id. at 33 (all-caps, bold, and enlarged font omitted)), brought "[a]gainst Defendant UNC[-]CH and Defendants Humphrey, Dodson, and Davis in both their official and individual capacities" (id. (bold font and italics omitted));

6) a claim for "battery [under] North Carolina [c]ommon [l]aw" (id. at 35 (all-caps, bold, and enlarged font omitted)), brought "[a]gainst Defendants Humphrey, Dodson, and Davis in their individual capacities" (id. (bold font and italics omitted));

7) a claim for "negligent infliction of emotional distress [under] North Carolina [c]ommon [l]aw" (id. at 36 (all-caps, bold, and enlarged font omitted)), brought "[a]gainst Defendants Humphrey, Dodson, and Davis in their individual capacities" (id. (bold font and italics omitted)); and

8) a "Corum claim [under] N.C. Const. art. I, § 20 and North Carolina [c]ommon [l]aw" (id. at 37 (all-caps, bold, and enlarged font omitted)), brought "[a]gainst all Defendants" (id. (bold font and italics omitted)).

Those claims arise from Plaintiff's allegations of Defendants' responsibility (as summarized in the SAC) for "the glaring lack of probable cause and overbreadth of [a] search warrant [for her cellular device], the severe and unnecessary force utilized to

-3-

retrieve [her] cellular device, and [her] targeting . . . because of her disability, as well as [an] inability to reasonably accommodate [her] when serving the search warrant . . . ." (Id. at 4; see also id. at 1-2 (alleging that, "[o]n September 19, 2024, [Plaintiff] participated in a free speech event on [Defendant] UNC[-]CH's campus . . . . At some point on that same day, there was an unrelated misdemeanor graffiti incident at the NAVAL ROTC building located on [Defendant] UNC[-]CH's campus. . . . [Defendant] UNC[-]CH . . . was able to identify [Plaintiff] because she is a wheelchair user, and therefore, easily identified and picked out in a crowd. . . . On September 26, 2024, Defendant [ ] Humphrey submitted a probable cause affidavit seeking a search warrant . . . for [Plaintiff's] cellular phone . . . ."), 3 ("On September 27, 2024, Defendants Humphrey, Dodson, and Davis served the warrant on [Plaintiff] . . . . Despite the fact that [they] heard and were aware that [she] intended to provide [them] with her phone after she turned it off, they declared that turning off the cellular device was destroying evidence and tackled her.").) As relief, the SAC requests both injunctive relief and damages from Defendants. (See id. at 39-40.)

"[P]ursuant to Rules 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure, [Defendants have] move[d] for dismissal of [the SAC] for lack of personal jurisdiction, lack of subject matter jurisdiction, and failure to state a claim upon which relief

-4-

can be granted." (Docket Entry 25 at 1.)  Plaintiff has responded

in opposition (see Docket Entry 29 ("Response")) and Defendants

have replied (see Docket Entry 30 ("Reply")).

DISCUSSION

According to Defendants' Brief in Support of the Dismissal

Motion, the SAC "should be dismissed for multiple reasons" (Docket

Entry 26 at 6):

> First, Plaintiff's § 1983 claims against [Defendant]
> UNC-CH and [ ] Defendants [Humphrey, Dodson, and Davis
> (collectively, "Individual Defendants")] in their
> official capacities fail because they are barred by
> sovereign immunity and because neither . . . [D]efendant[
> UNC-CH nor any of its employees in their official
> capacity] are considered "persons" under § 1983. Second,
> each of Plaintiff's § 1983 claims against the Individual
> Defendants in their individual capacities are barred by
> qualified immunity, as she failed to allege violations of
> her clearly established rights. Third, Plaintiff failed
> to properly allege § 1983 claims against Defendants upon
> which relief can be granted, as she failed to allege
> violations of her rights beyond conclusory statements and
> speculation.
>
> Similarly, Plaintiff's [Americans with Disabilities Act]
> and Rehabilitation Act claims should be dismissed because
> she failed to state a claim upon which relief can be
> granted, and because neither law provides for the right
> to not be perceived, noticed, or recognized.
>
> Plaintiff's state law tort claims must be dismissed
> because the Individual Defendants are entitled to public
> official immunity and because this Court lacks personal
> and subject matter jurisdiction over Plaintiff's claim of
> negligent infliction of emotional distress.
>
> Finally, Plaintiff's *Corum* claim alleging violations of
> the North Carolina Constitution must be dismissed due to
> Eleventh Amendment immunity and because an adequate
> remedy exists under state law such that she would be able
> to enter a courtroom and argue her case.  That she would

-5-

not be successful does not render her remedy there inadequate.

(Id. at 6-7.)

Before evaluating the substance of those arguments for dismissal, the Court first should address the question of which procedural rule applies to them. In connection with the first of those arguments – regarding "Plaintiff's § 1983 claims against [Defendant] UNC-CH and the Individual Defendants in their official capacities" (id. at 8) – Defendants have sought "dismiss[al] pursuant to Rule 12(b)(1), (2), and (6) of the Federal Rules of Civil Procedure under the doctrine of sovereign immunity." (Id. (emphasis added); see also id. at 5 (arguing that "[q]uestions of sovereign immunity are appropriately resolved under Rules 12(b)(1) and 12(b)(2)" and that "[United States Court of Appeals for] the Fourth Circuit has held that questions of sovereign immunity may be resolved as jurisdictional issues under [Rules] 12(b)(1) and [12(b)](2), or as failure to state a claim under Rule 12(b)(6)").)[2] Defendants also have invoked sovereign immunity in relation to Plaintiff's claim for negligent infliction of emotional distress against Individual Defendants in their individual capacities (see

---

[2] For that latter proposition, Defendants cited Andrews v. Daw, 201 F.3d 521, 525 n.2 (4th Cir. 2000). (See Docket Entry 26 at 5.) A fair reading of that footnote shows that the Fourth Circuit therein rendered no holding endorsing resolution of sovereign immunity arguments under any of Rules 12(b)(1), 12(b)(2), and/or 12(b)(6), but instead recognized that its prior "cases ha[d] been unclear on whether a dismissal on Eleventh Amendment immunity grounds is a dismissal for failure to state a claim under Rule 12(b)(6) or a dismissal for lack of subject matter jurisdiction under Rule 12(b)(1)," Andrews, 201 F.3d at 525 n.2. See id. ("[a]ssum[ing] without deciding that a dismissal on Eleventh Amendment immunity grounds is a final judgment on the merits for purposes of res judicata").

-6-

id. at 31) and Eleventh Amendment immunity in relation to her "*Corum* claim against [Defendant] UNC-CH and Individual Defendants in their official capacities" (id. at 32). (See id. at 31-34.)[3]

As quoted above, Defendants have raised their sovereign immunity-related arguments under Rule 12(b)(1), Rule 12(b)(2), and Rule 12(b)(6). "Under Rule 12(b)(1), a party may seek dismissal based on the [C]ourt's 'lack of subject-matter jurisdiction.'" Hoelzer v. Board of Governors of Univ. of N.C., No. 1:20CV1072, 2022 WL 973069, at *2 (M.D.N.C. Mar. 31, 2022) (unpublished) (Biggs, J.) (quoting Fed. R. Civ. P. 12(b)(1)). "A motion under Rule 12(b)(1) raises the question of 'whether the plaintiff has a right to be in the district court at all and whether the [district] court has the power to hear and dispose of the claim.'" Id. (internal brackets omitted) (quoting Holloway v. Pagan River Dockside Seafood, Inc., 669 F.3d 448, 452 (4th Cir. 2012)); see also id. at *3 ("'[T]he Eleventh Amendment is a block on the exercise of [subject-matter] jurisdiction.'" (quoting Roach v. West Va. Reg'l Jail & Corr. Facility Auth., 74 F.3d 46, 48 (4th Cir. 1996))). In turn, "[w]hen a [district] court's personal

---

[3] "The phrase 'Eleventh Amendment immunity' is often used . . . as a convenient shorthand for state sovereign immunity. But the phrase is something of a misnomer. Cases that use the phrase 'Eleventh Amendment immunity' are generally understood as speaking about state sovereign immunity more broadly." Jackson Creek Marine, LLC v. Maryland, 153 F.4th 423, 430 n.5 (4th Cir. 2025) (internal citations and some quotation marks omitted); see also Edelman v. Jordan, 415 U.S. 651, 662-63 (1974) ("While the [Eleventh] Amendment by its terms does not bar suits against a State by its own citizens, th[e United States Supreme] Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State.").

-7-

jurisdiction is properly challenged by a Rule 12(b)(2) motion, the jurisdictional question thus raised is one for the judge, with the burden on the plaintiff ultimately to prove the existence of a ground for jurisdiction by a preponderance of the evidence." Combs v. Bakker, 886 F.2d 673, 676 (4th Cir. 1989). The limitation on a district court's exercise of personal jurisdiction "flows not from Art[icle] III, but from the Due Process Clause and protects the individual liberty of the parties." Jackson Creek Marine, LLC v. Maryland, 153 F.4th 423, 429 n.4 (4th Cir. 2025) (internal quotation marks omitted). Conversely, Rule 12(b)(6) does not concern the jurisdiction of the district court; instead, "[t]he purpose of a Rule 12(b)(6) motion is to test the sufficiency of a complaint," Butler v. United States, 702 F.3d 749, 752 (4th Cir. 2010) (internal quotation marks omitted), such as by asking whether it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

When deciding which of the foregoing rule provisions should apply to Defendants' sovereign immunity-related arguments, the Court should note that "sovereign immunity is a sovereign's privilege not to be amenable to the suit of an individual without its consent." Jackson Creek, 153 F.4th at 428 (internal quotation marks omitted). "[S]tate sovereign immunity derives from the structure of the original Constitution itself." Id. at 429; see

-8-

also <u>id.</u> ("[T]he Eleventh Amendment does not memorialize the full breadth of the sovereign immunity retained by the States. Rather, the amendment is but one particular exemplification of that immunity." (internal brackets, citation, and quotation marks omitted)). "In practice, sovereign immunity limits the grant of judicial authority in Art[icle] III." <u>Id.</u> at 428 (internal quotation marks omitted). From that perspective, "[i]n cases where state sovereign . . . immunity is asserted, a motion to dismiss based on sovereign immunity is a jurisdictional issue." <u>Stevens v. Cabarrus Cnty. Bd. of Educ.</u>, 514 F. Supp. 3d 797, 818 (M.D.N.C. 2021) (Schroeder, C.J.) (internal brackets and quotation marks omitted); <u>see also</u> <u>Jackson Creek</u>, 153 F.4th at 428 n.4 ("Federal courts must possess two distinct types of jurisdiction to hear a case. The first is subject matter jurisdiction . . . . The second is personal jurisdiction . . . . Sovereign immunity has some of the characteristics of both types of jurisdiction."); <u>Constantine v. Rectors & Visitors of George Mason Univ.</u>, 411 F.3d 474, 480 (4th Cir. 2005) ("Eleventh Amendment immunity has attributes of both subject-matter jurisdiction and personal jurisdiction.").

That conclusion effectively eliminates Rule 12(b)(6) as a vehicle for raising sovereign immunity and leaves as options Rule 12(b)(1) and Rule 12(b)(2); however, the Court need go no further, because "whether consideration is made pursuant to Rule 12(b)(1) or [Rule 12](b)(2) appears to have no impact on the method of review."

-9-

<u>Stevens</u>, 514 F. Supp. 3d at 818 n.12. "Either way," <u>Gulledge v. Cabarrus Cnty. Bd. of Educ.</u>, No. 24CV916, 2025 WL 1332311, at *2 (M.D.N.C. May 7, 2025) (unpublished) (Faber, S.J.), "[t]he [C]ourt is to 'draw all reasonable inferences and resolve all factual disputes in [ P]laintiff['s] favor,'" <u>id.</u> (quoting <u>Stevens</u>, 514 F. Supp. 3d at 818); <u>see also</u> <u>Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd.</u>, 911 F.3d 192, 196 (4th Cir. 2018) ("[W]hen considering a motion to dismiss under Rule 12(b)(2) at [a case's] preliminary stage, . . . [courts] give the plaintiffs' allegations a favorable presumption, taking the allegations in the light most favorable to the plaintiff."); <u>RPR & Assocs. v. O'Brien/Atkins Assocs., P.A.</u>, 921 F. Supp. 1451, 1460-61 (M.D.N.C. 1995) (Osteen, Sr., J.) ("In a Rule 12(b)(1) case, the court must give the plaintiff the same procedural protections provided under Rule 12(b)(6); thus, all the facts alleged in the complaint are drawn in the plaintiff's favor."), <u>aff'd</u>, Nos. 96-1130, 96-1131, 103 F.3d 120 (table), 1996 WL 680724 (4th Cir. Nov. 26, 1996) (unpublished).

<u>Section 1983 Claims against Defendant UNC-CH and<br>Individual Defendants in Their Official Capacities</u>

The SAC includes Section 1983 claims for (A) an "unreasonable search[] under the Fourth Amendment" (Docket Entry 20 at 15), "[a]gainst Defendant UNC[-]CH and [Individual] Defendants . . . in both their official and individual capacities" (<u>id.</u> (bold font and italics omitted)), and (B) "retaliation in violation of the First Amendment" (<u>id.</u> at 33 (all-caps, bold, and enlarged font omitted)),

-10-

"[a]gainst Defendant UNC[-]CH and [Individual] Defendants . . . in both their official and individual capacities" (id. (bold font and italics omitted)).[4]  For the former Section 1983 claim, the SAC requests entry of "a permanent injunction enjoining all Defendants from continuing to review and possess contents of [Plaintiff's] cellular phone pursuant to the search warrant and ordering Defendants to destroy any information that is currently in their possession that was retrieved pursuant to the search warrant" (id. at 39 (emphasis added)), as well as "damages against [Individual] Defendants . . . in their individual capacities, for violation of [her] Fourth Amendment right" (id. at 39-40 (emphasis added)). But, for the latter Section 1983 claim, the SAC does not limit its damages demand to Individual Defendants in their individual capacities; to the contrary, the SAC more broadly seeks "damages against Defendants for retaliating against Plaintiff in violation of [the] First Amendment" (id. at 39 (emphasis added)), while also seeking entry of "a permanent injunction enjoining all Defendants from utilizing [her] participation in protests . . . as a basis for subjecting her to highly invasive searches and seizures when she has not been accused of committing a crime" (id. (emphasis added)).

Defendants have argued that "Plaintiff's [Section] 1983 Claims against [Defendant] UNC-CH and the Individual Defendants in their

_____

[4] "[T]he Fourth Amendment[] appli[es] to the States by virtue of the Fourteenth Amendment . . . ."  Zurcher v. Stanford Daily, 436 U.S. 547, 549 (1978).  "The First Amendment[ also] . . . appli[es] to the States through the Fourteenth Amendment . . . ."  Reed v. Town of Gilbert, 576 U.S. 155, 163 (2015).

-11-

official capacities should be dismissed . . . under the doctrine of sovereign immunity." (Docket Entry 26 at 8.) Plaintiff's Response does not develop any contrary argument regarding the two Section 1983 claims lodged against Defendant UNC-CH or the damages component of the First Amendment-based, Section 1983 claim lodged against Individual Defendants in their official capacities. (See Docket Entry 29 at 4-14 (omitting from discussion of Section 1983 claim for unconstitutional search any contention that such claim could proceed against Defendant UNC-CH), 16-19 (omitting from discussion of Section 1983 claim for unconstitutional retaliation any contention that such claim could proceed against Defendant UNC-CH or against Individual Defendants in their official capacities for damages). Plaintiff's silence in that regard likely stems from the fact that the doctrine of state sovereign immunity (as construed by the Supreme Court, the Fourth Circuit, and members of this Court) definitively forecloses those Section 1983 claims.

For starters, the Supreme Court has held that, in light of the "fundamental principle of sovereign immunity, the States, in the absence of consent, are immune from suits brought against them by their own citizens," Welch v. Texas Dep't of Highways & Pub. Transp., 483 U.S. 468, 487 (1987) (internal brackets and quotation marks omitted), unless Congress has exercised its authority under Section 5 of the Fourteenth Amendment "to enforce the provisions of the [Fourteenth] Amendment by creating private remedies against the

-12-

States for actual violations of those [Fourteenth Amendment] provisions," United States v. Georgia, 546 U.S. 151, 158 (2006) (internal ellipsis, emphasis, and quotation marks omitted). "This immunity also extends to state agencies and other governmental entities that can be viewed as arms of the state." Doe v. University of N.C. Sys., 133 F.4th 305, 313 (4th Cir. 2025). "Similarly, lawsuits brought against [state] employees in their official capacity represent only another way of pleading an action against an entity of which an officer is an agent, and they may also be barred by sovereign immunity." Lewis v. Clarke, 581 U.S. 155, 152 (2017); see also id. ("In an official-capacity claim, the relief sought is only nominally against the official and in fact is against the official's office and thus the sovereign itself.").

Pursuant to those precepts, the Fourth Circuit has ruled that Defendant UNC-CH qualifies as an arm of the State entitled to sovereign immunity, just like all the University of North Carolina ("UNC") system's "constituent institutions," Doe, 133 F.4th at 314. See id. (ruling that, per long-standing precedent, "district court erred in denying the UNC institutions' motion to dismiss [Section 1983] claims against them on sovereign immunity grounds"); accord, e.g., Hoelzer v. Board of Governors of Univ. of N.C., No. 1:20CV1072, 2022 WL 973069, at *4 (M.D.N.C. Mar. 31, 2022) (unpublished) (Biggs, J.); see also Blackburn v. Trustees of Guilford Tech. Cmty. Col., 822 F. Supp. 2d 539, 542-43 (M.D.N.C.

-13-

2011) (Schroeder, J.) ("State-funded colleges and universities structured to have close ties to the State are considered arms of the State for Eleventh Amendment purposes." (internal brackets and quotation marks omitted)). The Fourth Circuit also recently reaffirmed its prior holding that, as concerns Section 1983 claims, North Carolina law "'does not waive North Carolina's sovereign immunity in its own courts, let alone [such] immunity in federal court.'" Doe, 133 F.4th at 314 (quoting Huang v. Board of Governors of Univ. of N.C., 902 F.2d 1134, 1139 (4th Cir. 1990)); see also Southeastern Pub. Safety Grp., Inc. v. Munn, No. 22-1114, 2024 WL 4625079, at *2-4 (4th Cir. Oct. 30, 2024) (unpublished) (rejecting arguments that North Carolina waived sovereign immunity and affirming dismissal of Section 1983 claims against state agency and its employees in their official capacities). And "Congress has not abrogated sovereign immunity for [Section] 1983 suits . . . ." Biggs v. North Carolina Dep't of Pub. Safety, 953 F.3d 236, 241 (4th Cir. 2020); see also, e.g., Dai v. University of N.C. at Chapel Hill, No. 1:02CV224, 2003 WL 22113444, at *10 (M.D.N.C. Sept. 2, 2003) (unpublished) (Beaty, J.) ("Congress did not intend the federal civil rights statutes, including [Section] 1983, to abrogate [state sovereign] immunity.").

Based on that controlling authority, "[t]he Court [should] find[ (A)] that . . . [Defendant] UNC-CH, a public university, [is an] arm[] of the [S]tate and, therefore, [sovereign] immunity bars

-14-

Plaintiff's [Section 1983] claims against [Defendant UNC-CH]," Hoelzer, 2022 WL 973069, at *4,[5] and (B) that her Section 1983 "claim[ for damages] against Individual Defendants in their official capacities likewise fail[s]," id., as "[s]tate officials sued in their official capacities for retrospective money damages have the same sovereign immunity accorded to the State," Hutto v. South Carolina Ret. Sys., 773 F.3d 536, 549 (4th Cir. 2014).[6]

That disposition would leave for consideration the injunctive-relief component of Plaintiff's Section 1983 claims against Individual Defendants in their official capacities for an unreasonable search in violation of the Fourth Amendment (see Docket Entry 20 at 15-25, 39) and for retaliation in violation of the First Amendment (see id. at 33-35, 39). Because the SAC does

---

[5] As to Defendant UNC-CH, "'[t]his jurisdictional bar applies regardless of the nature of the relief sought.'" Jennings v. University of N.C. at Chapel Hill, 240 F. Supp. 2d 492, 498 (M.D.N.C. 2002) (Tilley, S.J.) (quoting Pennhurst State Sch. & Hosp. v. Halderman, 465 U.S. 89, 100 (1984)); see also Biggs, 953 F.3d at 242 ("[T]he *Ex Parte Young* exception to sovereign immunity . . . doesn't allow for suits against state agencies.").

[6] Alternatively, as Defendants have argued (see Docket Entry 26 at 10-11) and Plaintiff has not disputed (see Docket Entry 29 at 4-14, 16-19), the Court should dismiss the Section 1983 claims against Defendant UNC-CH (for damages and/or injunctive relief) and Individual Defendants in their official capacities (for damages), because "they are not 'persons' within the meaning of [Section] 1983," Huang, 902 F.2d at 1139 n.6 (citing Will v. Michigan Dep't of State Police, 491 U.S. 58, 68-71 (1989)). Indeed, given that obvious, fatal defect, as well as the clear applicability of the sovereign immunity bar, Plaintiff's (and her counsel's) inclusion of those claims in the SAC appears frivolous (and likely sanctionable). See Neitzke v. Williams, 490 U.S. 319, 325 (1989) (deeming claim "frivolous where it lacks an arguable basis either in law or in fact"); see also DeBauche v. Trani, 191 F.3d 499, 512 (4th Cir. 1999) (emphasizing that "Federal Rule of Civil Procedure 11 allows sanctions against attorneys and parties who file pleadings that contain 'claims . . . that are not warranted by existing law or by a nonfrivolous argument for the extension, modification, or reversal of existing law or the establishment of new law'" (internal brackets omitted) (quoting Fed. R. Civ. P. 11(b)(2) and citing Fed. R. Civ. P. 11(c))).

-15-

not contain sufficient factual allegations to support a reasonable inference that Plaintiff presently faces violation by Individual Defendants of her right against unconstitutional searches or of her right against unconstitutional retaliation, the Court should dismiss those Section 1983 claims against Individual Defendants in their official capacities (even if limited to injunctive relief).

En route to that result, the Court may observe that the SAC alleges that, "[w]hen a plaintiff is seeking injunctive relief, then the state official acting in an official capacity is a person under [Section] 1983, and official-capacity actions for prospective relief are not treated as actions against the State." (Id. at 15 (internal quotation marks omitted).) With that allegation, Plaintiff effectively invoked "*Ex parte Young*, 209 U.S. 133 [(1908)], [which] established an important limit on the sovereign-immunity principle," Virginia Off. for Prot. & Advoc. v. Stewart, 563 U.S. 247, 254 (2011) (internal parallel citation omitted), "to permit the federal courts to vindicate federal rights," id. at 255 (internal quotation marks omitted). In terms of constitutional theory, the Ex parte Young doctrine posits that, "when a federal court commands a state official to do nothing more than refrain from violating federal law, [that official] is not the State for sovereign-immunity purposes." Id. at 255. More practically speaking, the Supreme Court has explained that, to "determin[e] whether the doctrine of Ex parte Young avoids [the state sovereign

-16-

immunity] bar to [an official-capacity] suit [against a state official], a [federal] court need only conduct a straightforward inquiry into whether the complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Id. (internal brackets and quotation marks omitted).

In aid of the Dismissal Motion, Defendants have argued "that [the Ex parte Young] exception is inapplicable here." (Docket Entry 26 at 11.) Specifically, their brief states:

> The doctrine of *Ex parte Young* provides that "federal courts may exercise jurisdiction over claims against state officials by persons at risk of or suffering from violations by those officials of federally protected rights, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is *only* prospective." *Republic of Paraguay v. Allen*, 134 F.3d 622, 627 (4th Cir. 1998) (emphasis added). The exception "does not permit judgments against state officers declaring that they violated federal law in the past." *P.R. Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 146 (1993). "Mere conjecture is insufficient to transform a one-time event into a continuing governmental practice or an ongoing violation." *DeBauche v. Trani*, 191 F.3d 499, 505 (4th Cir. 1999). The *Ex parte Young* exception only permits prospective injunctive relief. *Allen v. Cooper*, 895 F.3d 337, 354-55 (4th Cir. 2018). Additionally, the Fourth Circuit has held that no ongoing violation exists when only the consequences of past actions persist. *See Republic of Paraguay*, 134 F.3d at 628; *DeBauche*, 191 F.3d at 505. Here, beyond her own conclusory statements, Plaintiff failed to allege any ongoing violation by [Individual] Defendants. Thus, *Ex [p]arte Young* does not apply.

(Docket Entry 26 at 11-12 (internal brackets and citation to SAC omitted).)

Plaintiff's Response, in turn, emphasizes that the SAC requests not just damages but also:

-17-

(1) A permanent injunction enjoining all Defendants from continuing to review and possess contents of [Plaintiff's] cellular phone pursuant to the search warrant and ordering Defendants to destroy any information that is currently in their possession that was retrieved pursuant to the search warrant; and (2) A permanent injunction enjoining all Defendants from utilizing [Plaintiff's] participation in protests or demonstrations . . . as a basis for subjecting her to highly invasive searches and seizures when she has not been accused of committing any crime.

(Docket Entry 29 at 13-14 (referring to Docket Entry 20 at 39); see also id. at 13 (insisting that SAC "does not seek declaratory relief"); but see also Docket Entry 20 at 4 ("Plaintiff respectfully requests declaratory relief that the Defendants violated her Fourth Amendment rights to be free from [unreasonable] search and seizure and to be free from excessive force . . . .").)

Taking those two injunction requests in reverse order, the Ex parte Young doctrine does not save Plaintiff's First Amendment-based, Section 1983 claim against Individual Defendants in their official capacities, because the SAC does not provide a non-conclusory, factual foundation for the Court to find a future threat of retaliatory searches of Plaintiff by Individual Defendants; rather, in the face of Defendants' authoritatively supported argument that "'[m]ere conjecture is insufficient to transform a one-time event into a continuing governmental practice or an ongoing violation'" (Docket Entry 26 at 11-12 (emphasis added) (quoting DeBauche, 191 F.3d at 505)), Plaintiff's Response merely proffers (A) the SAC's vague "alleg[ation] that 'Plaintiff

-18-

intends to continue engaging in First Amendment protected activity on [Defendant] UNC[-]CH's campus'" (Docket Entry 29 at 13 (quoting Docket Entry 20 at 4)), and (B) the SAC's bald "alleg[ation] that Defendants' practice of targeting her because of her free speech activity . . . has chilled her free speech rights and has future implications for her First Amendment right to engage in protected activity on [Defendant] UNC-CH's campus in the future" (id. (emphasis added) (citing Docket Entry 20 at 35)). That proffer falls short; simply put, the SAC's allegations that Individual Defendants obtained and/or executed a single search warrant for Plaintiff's cellular telephone on one occasion (see Docket Entry 20 at 1 ("This action challenges the validity of a highly invasive, broad, and vague search warrant . . . ." (emphasis added)), 6-15 (discussing only one search warrant in section designated for "Factual Allegations" (all-caps, bold, and enlarged font, as well as underscoring, omitted))) does not support a reasonable inference that Individual Defendants have adopted a "practice of targeting [Plaintiff] because of her free speech activity" (Docket Entry 29 at 13 (emphasis added)). See DeBauche, 191 F.3d at 505 (rejecting notion that "mere conjecture" could "transform a one-time event into a continuing governmental practice").[7]

---

[7] Plaintiff's forecast of future harm by Individual Defendants via future retaliatory searches also depends on numerous, other, unsupported assumptions, including that (A) her unidentified, anticipated protest activity on Defendant UNC-CH's campus will coincide with criminal activity that will result in investigations, and (B) Individual Defendants will conduct those investigations.

Nor should the Court conclude otherwise based on Plaintiff's (lone) citation to <u>Defoe v. Spiva</u>, 566 F. Supp. 2d 748, 753 (E.D. Tenn. 2008) (<u>see</u> Docket Entry 29 at 13). In that case, the student-plaintiff twice wore to school (and refused to remove) clothing items with a "confederate flag," <u>Defoe</u>, 566 F. Supp. 2d at 750, which led to his "suspen[sion] for insubordination," <u>id.</u> The student-plaintiff sought an injunction (A) barring enforcement of the school's dress code to preclude him from wearing such clothing, <u>see</u> <u>id.</u> at 752 (indicating that the student-plaintiff wanted relief against "subject[ion] to the dress code on any future visits to the school"), and (B) "'expung[ing ] any references to any disciplinary action in [his] records relating to [his] wearing items bearing the flag,'" <u>id.</u> at 753. The defendants contended that those injunctive-relief requests "ha[d] been mooted as a result of [the student-]plaintiff['s ] withdrawal from school." <u>Id.</u> at 751. The court rejected that contention "[b]ecause [the student-]plaintiff] continue[d] to have a reason to visit [the s]chool and will be subject to the dress code when he does, and because [he] request[ed] that his record be expunged, [such that his] claims [we]re not moot." <u>Id.</u> at 753; <u>see also</u> <u>id.</u> at 752 (stating that, on post-withdrawal visit to school, the student-plaintiff "was informed that the dress code still applied to him").

By contrast, (A) Defendants have not raised a mootness challenge (based on Plaintiff's withdrawal from Defendant UNC-CH or

-20-

for any other reason) (see Docket Entry 26 at 11-12), (B) Plaintiff has not identified factual allegations showing that anyone (much less Individual Defendants) either subjected her to an expression-related policy (akin to the dress-code policy enforced in Defoe) or told her that any such policy would apply when she visited Defendant UNC-CH's campus (see Docket Entry 29 at 12-14), and (C) Plaintiff has not requested expungement of any disciplinary record as injunctive relief for her First Amendment-based, Section 1983 claim (see Docket Entry 20 at 39). In other words, "[t]he single decision [cited by Plaintiff] . . . is procedurally inapposite and sheds no light on the issue before the [C]ourt." Bull v. United States, 68 Fed. Cl. 212, 246 n.28 (2005).

Lastly (as to the Section 1983 claims against Individual Defendants in their official capacities), Plaintiff would have the Court apply the Ex parte Young doctrine to her claim for an unreasonable search under the Fourth Amendment, given that the SAC requests an injunction barring them "from continuing to review and possess contents of [her] cellular phone pursuant to the search warrant and ordering [them] to destroy any information that is currently in their possession that was retrieved pursuant to the search warrant" (Docket Entry 20 at 39 (emphasis added)). (See Docket Entry 29 at 13.) In particular, Plaintiff has argued that Ex parte Young permits her to proceed against Individual Defendants in their official capacities because the SAC "alleges that

-21-

Defendants' possession of materials from her cellphone has ongoing implications and continues to harm her privacy interests." (Id. (emphasis added).) To support that argument, Plaintiff cited Paragraphs 19, 118, and 121 of the SAC. (See id.)

Paragraph 19 states: "Plaintiff . . . is a student at [Defendant UNC-CH] and resides in the dormitory at [Defendant] UNC-CH. [Plaintiff's] cellular phone is the subject of the search warrant at issue in this case. [Plaintiff] has a direct and immediate privacy interest in the property seized." (Docket Entry 20 at 5.) Paragraph 118 (within the claim for unreasonable search[8]) states: "Because there is no nexus between facts stated in the affidavit [for the search warrant] and [Plaintiff's] internet browser file, social media accounts, and electronic correspondence, seizure of this property violated Plaintiff's Fourth Amendment right to be free from unreasonable seizure." (Id. at 25.)[9] Paragraph 121 (within the claim for unreasonable search) states: "This violation can only be cured through prospective injunctive relief from the Court." (Id. (citing Constantine, 411

_____

[8] The SAC's unreasonable search claim runs from Paragraphs 64 through 121. (See Docket Entry 20 at 15-25.) At that point, i.e., the start of the second claim (for excessive force), the SAC's paragraph numbering reverts back to 105 and then continues to 182 (at the end of the final claim). (See id. at 25-39.) As a result, the SAC includes two different versions of Paragraphs 105 through 121, the first of each pertaining to the unreasonable search claim and the second of each pertaining to either the excessive force claim or the Americans with Disabilities Act claim. (See id. at 22-28.)

[9] The second Paragraph 118 falls within the SAC's third claim, which seeks relief for a violation of the Americans with Disabilities Act (see Docket Entry 20 at 27-31), and simply quotes language from said Act (see id. at 28).

-22-

F.3d at 496, and parenthetically quoting said case for proposition that "'Eleventh Amendment does not bar a suit against a State official for prospective injunctive relief,'" while noting said case's citation to <u>Ex parte Young</u>).)[10]

The above-quoted, plain language of those paragraphs of the SAC does <u>not</u> provide any factual support for Plaintiff's naked assertion that Individual Defendants currently maintain "possession of materials from her cellphone" (Docket Entry 29 at 13). And – to the extent the Court chose to review the SAC for pertinent allegations beyond Plaintiff's own citation – that review confirms the lack of any non-conclusory, factual matter in the SAC that could justify an inference that Individual Defendants "continu[e] to review and possess contents of [her] cellular phone" (Docket Entry 20 at 39). (<u>See, e.g.</u>, <u>id.</u> at 5-6 (identifying Individual Defendants by reference to roles in securing/serving warrant while alleging no facts showing current custody or control of contents of Plaintiff's cellular telephone), 6-14 (dividing "Factual Allegations" of SAC into categories entitled "Application for the Search Warrant" and "Execution of the Search Warrant," neither of which contain any factual allegations regarding Individual Defendants' access (past, present, or future) to information

---

[10] The second Paragraph 121, which falls within the SAC's claim for violation of the Americans with Disabilities Act (<u>see</u> <u>id.</u> at 27-31), alleges that "[Plaintiff] is disabled as is defined under th[at ] Act, and she is qualified and entitled to receive the benefits of the non-discriminatory administration of her collegiate education, including participating in First Amendment protected activity on her public university's campus" (<u>id.</u> at 28).

extracted from Plaintiff's cellular telephone (all-caps, bold, and enlarged font, as well as underscoring, omitted)), 25 (baldly asserting without any factual foundation that unspecified "Defendants continue to be in possession of highly private and sensitive information retrieved pursuant to the search warrant and Defendants [sic] continuous possession of this information represents an ongoing violation of [Plaintiff's] right to privacy and to be free from having her information unreasonably seized").)

Under the Ex parte Young doctrine, "federal courts may exercise jurisdiction over claims against state officials [in their official capacities] by persons at risk of or suffering from violations by those officials of federally protected rights, if (1) the violation for which relief is sought is an ongoing one, and (2) the relief sought is only prospective." Republic of Paraguay, 134 F.3d at 627 (emphasis added and original emphasis omitted). As concerns possession, custody, and/or control of the contents of Plaintiff's cellular telephone, the record substantiates Defendants' argument that the SAC "fail[s] to allege any ongoing violation by [Individual] Defendants. Thus, Ex [p]arte Young does not apply." (Docket Entry 26 at 12 (emphasis added).)[11]

---

[11] For that same reason, Plaintiff cannot maintain a claim for injunctive relief for an unreasonable search against Individual Defendants in their individual capacities. See, e.g., Kenny v. Wilson, 885 F.3d 280, 287 (4th Cir. 2018) (recognizing that, under standing doctrine, plaintiffs "seek[ing] . . . injunctive relief . . . must establish an ongoing or future injury in fact" (emphasis added)); see also Scott v. DiGuglielmo, 615 F. Supp. 2d 368, 373 (E.D. Pa. 2009) ("If the defendants have no power to redress the alleged injuries even if the court were to grant the requested relief, the plaintiff has no case or
(continued...)

-24-

In sum, the Court should dismiss the Section 1983 claims against Defendant UNC-CH and against Individual Defendants in their official capacities due to state sovereign immunity.

<u>Section 1983 Claim for Unreasonable Search against</u>
<u>Individual Defendants in Their Individual Capacities</u>

Along with Defendant UNC-CH and Individual Defendants in their official capacities, the SAC also presses the Section 1983 claim "for violation of [Plaintiff's] right to be free from unreasonable searches" (Docket Entry 20 at 15), against Individual Defendants in their "individual capacities" (<u>id.</u> (bold font and italics omitted)).  Said claim encompasses these three sub-claims:

1) the search warrant "was based on false statements made in bad faith" (<u>id.</u> at 17 (standard capitalization applied) (bold font omitted));

2) "the [search warrant] affidavit relied [on] only purely conclusory statements[ and] therefore . . . did not establish probable cause" (<u>id.</u> at 21 (standard capitalization applied) (bold font omitted)); and

---

[11](...continued)
controversy against those particular defendants.").  That conclusion does not leave Plaintiff without a remedy to recover any data retrieved from her cellular telephone.  <u>See</u> N.C. Gen. Stat. § 15-11.1(a) (placing control of seized property "under the direction of the court or magistrate as long as necessary to assure that the property will be produced at and may be used as evidence in any trial," subject to authority of "district attorney [to] release any property seized . . . if he [or she] determines such property is no longer useful or necessary as evidence in a criminal trial and he [or she] is presented with satisfactory evidence of ownership," as well as right of "lawful owner . . . [to] make application to the court for return of the property").

-25-

3) "the search warrant was overbroad in violation of the Fourth Amendment's particularity requirement" (id. at 23 (standard capitalization applied) (bold font omitted)).

Individual Defendants have requested "dismiss[al of this claim] because they are entitled to qualified immunity." (Docket Entry 26 at 12.) "The doctrine of qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). "Determining whether qualified immunity applies involves a two-prong inquiry: whether the facts make out a violation of a constitutional right and whether the right at issue was clearly established at the time of [the] defendant's alleged misconduct." West v. Murphy, 771 F.3d 209, 213 (4th Cir. 2014) (internal ellipsis and quotation marks omitted).

In conjunction with Individual Defendants' request for dismissal due to qualified immunity, they also have argued that the instant "claim[] should be dismissed pursuant to Rule 12(b)(6) because [Plaintiff] failed to state [a] claim[] upon which relief can be granted." (Docket Entry 26 at 15; see also id. at 14 (linking qualified-immunity argument to discussion "in the following section" concerning Plaintiff's failure to state a claim). That linkage makes sense because, "to survive a qualified

-26-

immunity-based [Rule] 12(b)(6) motion to dismiss[, Plaintiff] must have plausibly alleged in [the SAC] that h[er] constitutional rights were violated," Tobey v. Jones, 706 F.3d 379, 386-87 (4th Cir. 2013) (emphasis added), just as a standard Rule 12(b)(6) motion asks whether the SAC "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," Iqbal, 556 U.S. at 678 (emphasis added) (internal quotation marks omitted).[12]

Here, the SAC clearly fails to state a claim for unreasonable search against Defendants Dodson and Davis, as – apart from its heading (see Docket Entry 20 at 15) – that claim does not even mention them directly (see id. at 15-25). Indeed, across the 11 pages of allegations comprising said claim, Plaintiff referred exclusively to actions/omissions by Defendant Humphrey (see id.), save for the penultimate paragraph, which declares (without specification or development) that "Defendants continue to be in possession of highly private and sensitive information retrieved pursuant to the search warrant and Defendants [sic] continuous possession of this information represents an ongoing violation of

---

[12] Moreover, consideration of qualified immunity during the pleading-review phase of the case safeguards an important interest, as "[q]ualified immunity is 'an entitlement not to stand trial or face the other burdens of litigation.'" Brown v. Gilmore, 278 F.3d 362, 366-67 (4th Cir. 2002) (emphasis added) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Accordingly, "[t]he Supreme Court has directed that 'qualified immunity questions should be resolved at the earliest possible stage of a litigation.'" Smith v. Reddy, 101 F.3d 351, 357 (4th Cir. 1996) (quoting Anderson v. Creighton, 483 U.S. 635, 646 n.6 (1987)); see also Mitchell, 472 U.S. at 526 ("Unless the plaintiff's allegations state a claim of violation of clearly established law, a defendant pleading qualified immunity is entitled to dismissal before the commencement of discovery.").

[Plaintiff's] right to privacy and to be free from having her information unreasonably seized" (id. at 25 (emphasis added)).

Similarly, in the SAC's introductory section, dubbed "Nature of the Action" (id. at 1 (all-caps, bold, and enlarged font, as well as underscoring, omitted)), Plaintiff did not allege that Defendants Dodson and Davis played any part in the issuance of the search warrant but instead alleged only that Defendants Dodson and Davis (along with Defendant Humphrey) participated in "serv[ing] the warrant on [Plaintiff] at her dormitory on [Defendant] UNC[-]CH's campus" (id. at 3; see also id. at 2 (alleging that, "[o]n September 26, 2024, Defendant [ ] Humphrey submitted a probable cause affidavit seeking a search warrant . . . for [Plaintiff's] cellular phone" and that therein "Defendant Humphrey provide[d] no facts to support the conclusory and false statement that [Plaintiff] utilized her phone 'to record the events surrounding what was occurring at the Naval ROTC Armory which included graffiti vandalism to the Naval ROTC Armory,'" all without alleging any role in preparation of affidavit or any knowledge of its contents by Defendants Dodson and Davis (errant capitalization corrected) (quoting Docket Entry 20-6 at 1)), 3-4 (setting out allegations about service of warrant by "Defendants," "requesting declaratory relief that the Defendants violated [Plaintiff's] Fourth Amendment rights to be free from [unreasonable] search and seizure and to be free from excessive force," and "request[ing] injunctive relief

-28-

prohibiting Defendants from reviewing and possessing any personal or private information retrieved pursuant to the search warrant," as well as "from utilizing [her] participation in protests or demonstrations . . . as a basis for subjecting her to highly invasive searches and seizures")). Likewise, under the heading of "Parties" (id. at 5 (all-caps, bold, and enlarged font, as well as underscoring, omitted)), the SAC states that "Defendant Humphrey was the affiant that sought issuance of the search warrant and alleged the existence of probable cause" (id.) and that Defendants Dodson and Davis "participated in the service of the warrant" (id. at 6), while omitting any allegation that Defendants Dodson or Davis took part in any aspect of the preparation of the search warrant affidavit or knew anything about the representations Defendant Humphrey made therein (see id. at 5-6).

The SAC's section for "Factual Allegations" (id. at 6 (all-caps, bold, and enlarged font, as well as underscoring omitted)) follows the same tack of attributing responsibility for the issuance of the search warrant solely to Defendant Humphrey (see, e.g., id. at 6-7 ("[Defendant] Humphrey sought issuance of a search warrant and submitted a probable cause affidavit . . . ."), 10 ("Defendant Humphrey [sic] probable cause affidavit contains zero information purporting to connect [Plaintiff's] internet history file, social media activity and correspondence, or mail correspondence to the graffiti incidence [sic]."), 11 ("Defendant

-29-

Humphrey deliberately sought th[e] information [on Plaintiff's cellular telephone] knowing he did not have probable cause because he wanted access to information about [Plaintiff] and other demonstrators' First Amendment protected activity. . . . [P]aragraphs [three, ten, and eleven of the search warrant affidavit] are conclusory statements by Defendant Humphrey . . . . Defendant Humphrey makes clear in paragraph eleven [of the search warrant affidavit] that the probable cause is, at least partially, based on [Plaintiff's] 'orchestration of the free speech event.'" (internal brackets omitted)), 12 ("For the reasons detailed above, Defendant Humphrey's search of [Plaintiff's] cellphone was a violation of her Fourth Amendment right to be free from unreasonable searches."), 18 ("In paragraph ten [of the search warrant affidavit], Defendant Humphrey alleges that he personally 'observed' [Plaintiff] in community submission video 'with her phone out and holding it in such a way to record or document the events surrounding what was occurring at the Naval ROTC Armory which included graffiti vandalism to the Naval ROTC Armory.'" (errant capitalization corrected) (emphasis omitted) (quoting Docket Entry 20-6 at 1)), 19 ("Defendant Humphrey's statements in paragraphs ten through twelve that [Plaintiff] filmed the graffiti vandalism were made with deliberate falsity. . . . Defendant Humphrey [sic] statements in paragraphs ten through twelve are based on his personal knowledge . . . . As a result, . . .

-30-

Defendant Humphrey had to know at the time he made the statements that they were false.  Upon information and belief, at the time Defendant Humphrey made the statements in paragraphs ten through twelve, he knew the statements were false and he made the statements intentionally, in bad faith, and in reckless disregard for the truth." (internal paragraph number omitted)), 20-21 (referring to "affidavit of Defendant Humphrey"), 22 (accusing "Defendant Humphrey [of] stat[ing] conclusively that community submission videos . . . show [Plaintiff] filming the graffiti incident"), 23 ("The sole statement in the affidavit that connects [Plaintiff] in any way to the graffiti incident is Defendant Humphrey's conclusory statements [sic] . . . . Defendant Humphrey provides no factual details about the community submission video other than his conclusion about what the video shows."), 24 ("Even if the Court accepts as true Defendant Humphrey [sic] false and conclusory statements that [Plaintiff] filmed the alleged vandalism, the search warrant is overly board [sic] . . . .").)

"To establish personal liability under [Section] 1983, however, [ P]laintiff must affirmatively show that the official charged <u>acted personally in the deprivation</u> of [ P]laintiff's rights." <u>Williamson v. Stirling</u>, 912 F.3d 154, 171 (4th Cir. 2018) (emphasis added) (internal brackets and quotation marks omitted). "That is, the official's '<u>own individual actions</u>' must have 'violated the Constitution.'" <u>Id.</u> (emphasis added) (quoting <u>Iqbal</u>,

-31-

556 U.S. at 676).  As the preceding discussion documents, the SAC "fail[s] to demonstrate that [Defendants Dodson and Davis] were personally involved in any deprivations [alleged as bases for this claim]," id. at 172 (emphasis added), i.e., obtaining the search warrant (A) "based on false statements made in bad faith" (Docket Entry 20 at 15 (standard capitalization applied) (bold font omitted)), (B) by "rel[ying on] only purely conclusory statements [which] . . . did not establish probable cause" (id. at 21 (standard capitalization applied) (bold font omitted)), and/or (C) with "overbroad [parameters] in violation of the Fourth Amendment's particularity requirement" (id. at 23 (standard capitalization applied) (bold font omitted)).

The Court therefore should dismiss Plaintiff's unreasonable search claim against Defendants Dodson and Davis in their individual capacities because the SAC does not plausibly allege that their "own individual actions . . . violated the Constitution," Williamson, 912 F.3d at 171 (internal quotation marks omitted).  See, e.g., Calderon v. City of N.Y., 138 F. Supp. 3d 593, 615 (S.D.N.Y. 2015) (dismissing claim against certain officers for unlawful "search of apartment" because "alleged willingness [of other officers] to falsify information so as to procure a search warrant cannot be imputed to the officers [in question] who conducted the ensuing search, conducted as it was pursuant to a facially valid warrant"); Harris v. Polk Cnty., No.

-32-

9:15CV14, 2015 WL 1459597, at *4-5 (E.D. Tex. Mar. 31, 2015) (unpublished) ("[The p]laintiffs assert that [the d]efendants are liable for unreasonable search and seizure because the search warrant was invalid. . . . For officers who prepare or present the probable-cause affidavit or the warrant [application] to the magistrate, the proper constitutional inquiry is whether a reasonably well-trained officer in th[at officer's] position would have known that [the] affidavit failed to establish probable cause and that he [or she] should not have applied for the warrant. . . . But . . . [such] liability does not extend beyond the affiant and a person who was fully responsible for a warrant application. . . . [The p]laintiffs' claims depend on whether [the] application for the search warrant was objectively reasonable. There is no allegation that . . . [these d]efendants were involved in the preparation or presentation of the affidavits or the search warrant [application]. Therefore, except for [the officer who prepared and presented the search warrant application], no other [officer] is subject to [Fourth Amendment] liability." (internal brackets and quotation marks omitted)), appeal dismissed, 620 F. App'x 322 (5th Cir. 2015); McNelis v. Ada Cnty., No. 1:12CV7, 2012 WL 12894479, at *4 (D. Idaho Sept. 7, 2012) (unpublished) (dismissing claim based on "alleged falsification of facts in a search warrant [application]" where "the [c]omplaint fail[ed] to demonstrate that [the o]fficer [in question] did

-33-

anything other than show up to assist in the execution of a search warrant that he did not himself prepare" and thus, "[w]hether one looks at the issue through the lens of qualified immunity or through the personal involvement requirement, it is clear that the [c]omplaint is deficient as to [this o]fficer" (internal quotation marks omitted)); see also Sampson v. Bethea, No. 4:16CV2821, 2018 WL 3867797, at *4 n.7 (D.S.C. Aug. 15, 2018) (unpublished) (holding that, "[e]ven assuming arguendo that the search warrant [at issue] was lacking in probable cause, [the d]efendant[-officer who helped execute that warrant wa]s entitled to qualified immunity," because "he had no involvement in securing the search warrant from the state magistrate judge" (italics omitted)); Harris, 2015 WL 1459597, at *5 ("[The p]laintiffs have not cited any authority that requires every officer executing a search warrant to independently determine probable cause himself [or herself].  An officer's reliance on a magistrate-issued search warrant is the clearest indication that he [or she] proceeded in an objectively reasonable manner" (internal quotation marks omitted)).[13]

Turning to Plaintiff's unreasonable search claim against Defendant Humphrey – and starting with the first sub-claim therein,

―――――――――――――――

[13] Given the lack of any colorable legal basis for the SAC's lodging of this claim against Defendants Dodson and Davis, a substantial question arises as to whether Plaintiff's counsel, through the act of "signing, filing, and submitting [the SAC]," Fed. R. Civ. P. 11(b), falsely "certifie[d] that to the best of [said counsel's] knowledge, information, and belief, formed after an inquiry reasonable under the circumstances," id., "the claim[ against Defendants Dodson and Davis was] . . . warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law," Fed. R. Civ. P. 11(b)(2).

-34-

i.e., that the search warrant "was based on false statements made in bad faith" (Docket Entry 20 at 17 (standard capitalization applied) (bold font omitted)) – the SAC correctly recites controlling authority holding that, "'[w]hen an officer improperly obtains a search warrant using deceptive falsities or omissions and uses that ill-gotten warrant to search and seize property, the Fourth Amendment's right to be free from unreasonable searches and seizures is violated'" (id. (quoting Smith v. Travelpiece, 31 F.4th 878, 884 (4th Cir. 2022), which cites, inter alia, Franks v. Delaware, 438 U.S. 154, 155–56 (1978))). According to the SAC, "to establish probable cause, paragraphs ten through twelve[ of the search warrant affidavit] include false statements made by Defendant Humphrey." (Id. at 18.) Defendants have disputed the adequacy of the SAC's "factual allegations to support [Plaintiff's] conclusion that Defendant[ Humphrey] knowingly made false statements in [his] affidavit . . . ." (Docket Entry 26 at 19.)

In terms of specific, supposedly false statements in Defendant Humphrey's search warrant affidavit, the SAC cites the following:

1) "[i]n paragraph ten [of his affidavit], Defendant Humphrey allege[d] that he personally 'observed' [Plaintiff] in community submission video 'with her phone out and holding it in such a way to record or document the events surrounding what was occurring at the Naval ROTC Armory which included graffiti vandalism to the Naval ROTC Armory'" (Docket Entry 20 at 18 (errant capitalization

-35-

corrected) (emphasis omitted) (quoting Docket Entry 20-6 at 1));
and

2) "[i]n paragraph twelve [of his affidavit], Defendant
Humphrey attache[d] two photographs that he allege[d] show
[Plaintiff] 'using her phone to support previously stated facts at
the Naval ROTC Armory'" (id. at 19 (errant capitalization
corrected) (quoting Docket Entry 20-7 at 1)).

The SAC labels those two statements "false" (id.) – and "made
with deliberate falsity" (id.), "intentionally, in bad faith, and
in reckless disregard for the truth" (id.) – by construing
Defendant Humphrey's above-quoted words as definitively stating
"that [Plaintiff] filmed the graffiti vandalism" (id.; see also id.
at 19-20 ("[T]he photographs [in paragraph twelve of the search
warrant application] do not show [Plaintiff] filming the graffiti
vandalism as Defendant Humphrey allege[d] in paragraph ten [of the
search warrant affidavit].")).  But a fair reading of Defendant
Humphrey's statement at issue belies Plaintiff's construction.  In
that regard, Defendant Humphrey stated that he had viewed video
depicting Plaintiff "with her phone out and holding it in such a
way to record or document the events surrounding what was occurring
at the Naval ROTC Armory which included graffiti vandalism to the
Naval ROTC Armory."  (Docket Entry 20-6 at 1.)  Fairly read, that
statement indicates (A) that the video to which Defendant Humphrey
referred showed Plaintiff "record[ing] or document[ing] the events

-36-

surrounding what was occurring at the Naval ROTC Armory" (id.) and (B) that "the events surrounding what was occurring at the Naval ROTC Armory" (id.) "included graffiti vandalism to the Naval ROTC Armory" (id.). A reasonable reader would have understood that "the events surrounding what was occurring at the Naval ROTC Armory" (id.) encompassed many things, "includ[ing] graffiti vandalism to the Naval ROTC Armory" (id.), not ALL of which Plaintiff (or anyone in or around the area) could have recorded. And, importantly, Defendant Humphrey did not state that Plaintiff recorded ALL those events (or the graffiti vandalism in particular). (See id.)

Nor would a reasonable reader have understood Defendant Humphrey's above-quoted statement as lacking significance unless it meant the video to which he referred literally showed Plaintiff recording the actual moment of "graffiti vandalism to the Naval ROTC Armory" (id.), as opposed to another part of the broader scope of "events surrounding what was occurring at the Naval ROTC Armory" (id.). To the contrary, a reasonable reader would recognize that footage recording "events surrounding what was occurring at the Naval ROTC Armory" (id.) would hold evidentiary value for an investigation into "graffiti vandalism to the Naval ROTC Armory" (id.), even if that footage only showed other "events surrounding what was occurring at the Naval ROTC Armory" (id.). For example, the perpetrators of the "graffiti vandalism to the Naval ROTC Armory" (id.) did not teleport onto the exact spot where they

-37-

committed their crime and then instantly teleport away; they came to the Naval ROTC Armory from somewhere and they presumably left after committing their crime, during either of which times (coming or leaving) they would have encountered others. Video footage of people in the area of "the events surrounding what was occurring at the Naval ROTC Armory" (id.) thus could help law enforcement officials identify the perpetrators of the "graffiti vandalism to the Naval ROTC Armory" (id.) and/or potential witnesses.

The Supreme Court has held that the Fourth Amendment's "Warrant Clause . . . takes the affiant's good faith as its premise." Franks, 438 U.S. at 164. Consistent with that understanding, "[t]here is, of course, a presumption of validity with respect to [Defendant Humphrey's] affidavit supporting the search warrant." Id. at 171. To call into question that presumption, Plaintiff "must make a substantial preliminary showing that false statements were either knowingly or recklessly included in [the] affidavit supporting [the] search warrant . . . ." United States v. Allen, 631 F.3d 164, 171 (4th Cir. 2011); see also United States v. Moody, 931 F.3d 366, 370 (4th Cir. 2019) (explaining that "substantial preliminary showing" requirement imposes "heavy burden" (internal quotation marks omitted)). To carry that "heavy burden," Moody, 931 F.3d at 370, Plaintiff must "show[] that the statements at issue are objectively false," id., and "must provide facts – not mere conclusory allegations – indicating that

-38-

[Defendant Humphrey] subjectively acted with intent to mislead, or with reckless disregard for whether the statements would mislead, the magistrate," id. at 371. For reasons detailed above, the SAC does not show that Defendant Humphrey's "statements at issue are objectively false," id. at 370, and does not provide anything beyond "mere conclusory allegations indicating that [he] subjectively acted with intent to mislead, or with reckless disregard for whether the statements would mislead, the magistrate," id. at 371 (dash omitted).

To that end, the Court should note that "warrant affidavits are 'normally drafted by nonlawyers in the midst and haste of a criminal investigation.'" Id. at 372 (quoting United States v. Ventresca, 380 U.S. 102, 108 (1965)). As a result, "[t]hey must be interpreted in a commonsense manner, neither held to the standard of what judges or lawyers feel they would have written if given the opportunity nor 'judged as an entry in an essay contest.'" Id. (quoting United States v. Harris, 403 U.S. 573, 579 (1971)). Critically, "[m]ere imprecision does not, by itself, show falsity." Id. Furthermore, where (as here) the record reflects, at most, a "lack of precision in the statements at issue, [the Court] cannot reasonably infer that [Defendant Humphrey] acted with intent to mislead or with reckless disregard of whether the statements would mislead." Id.; see also United States v. Harper, No. 7:20CR131, 2023 WL 3432186, at *6 (E.D.N.C. Mar. 10, 2023) (unpublished)

-39-

(rejecting reliance on warrant-challenger's "preferred interpretation" of wording in search warrant affidavit as "prime example of an argument about technical style and writing that nonlawyers are not expected to have mastered, especially law enforcement officers in the 'midst and haste of a criminal investigation'" (quoting Moody, 931 F.3d at 372)), recommendation adopted, 2023 WL 2967886 (E.D.N.C. Apr. 17, 2023) (unpublished).

For all of those reasons, the Court should conclude that the SAC fails to state an unreasonable search claim against Defendant Humphrey in his individual capacity for obtaining the search warrant "based on false statements made in bad faith" (Docket Entry 20 at 17 (standard capitalization applied) (bold font omitted)). Next, the SAC seeks to impose liability on Defendant Humphrey for a Fourth Amendment violation on the ground that "the [search warrant] affidavit relied [on] only purely conclusory statements[ and] therefore . . . did not establish probable cause." (Id. at 21 (standard capitalization applied) (bold font omitted).) This sub-claim also fails as a matter of law.

"The Fourth Amendment commands that 'no Warrants shall issue, but upon probable cause, supported by Oath or affirmation . . . .'" United States v. Orozco, 41 F.4th 403, 407 (4th Cir. 2022) (emphasis added) (quoting U.S. Const. amend. IV). "Probable cause is 'not a high bar,' and it must be assessed objectively based on a totality of the circumstances . . . ." United States v. Jones,

-40-

952 F.3d 153, 158 (4th Cir. 2020) (quoting <u>District of Columbia v. Wesby</u>, 583 U.S. 48, 57 (2018)); <u>see also</u> <u>Illinois v. Gates</u>, 462 U.S. 213, 235 (1983) ("[T]he quanta of proof appropriate in ordinary judicial proceedings are inapplicable to the decision to issue a warrant. Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the magistrate's decision." (italics, internal citation, ellipsis, and quotation marks omitted)); <u>Ventresca</u>, 380 U.S. at 107 ("[A] finding of probable cause may rest upon evidence which is not legally competent in a criminal trial." (internal quotation marks omitted)); <u>United States v. Gondres-Medrano</u>, 3 F.4th 708, 714 (4th Cir. 2021) ("Probable cause has long been understood to encompass circumstances . . . less than a preponderance . . . ."); <u>United States v. Lalor</u>, 996 F.2d 1578, 1582 (1993) ("[P]robable cause can be inferred from the circumstances, and a warrant is not invalid for failure to produce direct evidence that the items to be seized will be found at a particular location."). As such, "[a search warrant] affidavit need not dot every i, cross every t, or . . . close every inferential loop." <u>Orozco</u>, 41 F.3d at 410 (internal quotation marks omitted); <u>see also</u> <u>Ventresca</u>, 380 U.S. at 108 ("[A]ffidavits for search warrants must be tested and interpreted . . . in a commonsense and realistic fashion. . . . Technical requirements . . . have no proper place in this area.").

-41-

"The task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit . . ., there is a fair probability that contraband or evidence of a crime will be found in a particular place." Gates, 462 U.S. at 238; see also id. at 235 (quoting with approval Chief Justice John Marshall's explication in Locke v. United States, 11 U.S. 339, 348 (1813), of "'term "probable cause'" as "'import[ing] a seizure made under circumstances which warrant suspicion'"); Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978) ("The critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." (internal quotation marks omitted)). Moreover, the Supreme Court "ha[s] repeatedly said that after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." Gates, 462 U.S. at 236 (italics and internal quotation marks omitted). Ultimately, "the duty of a reviewing court is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed." Id. at 238-39 (internal brackets, ellipsis, and quotation marks

-42-

omitted).  "[S]o long as the magistrate had [such] a substantial basis . . ., the Fourth Amendment requires no more."  Id. at 236.

The SAC contends that (A) the state judicial official[14] who issued the search warrant for Plaintiff's cellular telephone lacked a "substantial basis for concluding that probable cause existed," id. at 238-39 (internal brackets, ellipsis, and quotation marks omitted), and thus (B) the "warrant violate[d] the Fourth Amendment's probable cause requirement [because (C) the warrant wa]s based on an affidavit that is 'purely conclusory' and states 'only the affiant's belief that probable cause exist[ed] without detailing any of the underlying circumstances upon which that belief [wa]s based'" (Docket Entry 20 at 21 (internal ellipsis and some quotation marks omitted) (quoting Gates, 462 U.S. at 288 (Brennan, J., dissenting), which there block-quotes Ventresca, 380 U.S. at 108-09); see also id. ("Recital of some of the underlying circumstances in the affidavit is essential if the magistrate is to perform his detached function and not serve merely as a rubber stamp for the police." (citing, and actually quoting without quotation marks, Gates, 462 U.S. at 288 (Brennan, J., dissenting), which there continues to block-quote Ventresca, 380 U.S. at 109))).  Even a cursory review of Defendant Humphrey's affidavit conclusively refutes the SAC's allegation that said affidavit "is purely conclusory and states only [Defendant Humphrey's] belief

_____

[14] North Carolina Superior Court Judge Allen Baddour (not a state magistrate) approved the search warrant at issue.  (See Docket Entry 20-1 at 1.)

-43-

that probable cause exist[ed] without detailing <u>any</u> of the underlying circumstances upon which that belief [wa]s based" (<u>id.</u> (internal quotation marks omitted)).  (<u>See</u> Docket Entry 20-6 at 1; Docket Entry 20-7 at 1; Docket Entry 20-8 at 1.)

By way of illustration, before stating his "belie[f that] there [wa]s probable cause that there would be evidence for the aforementioned crime [of graffiti vandalism in violation of North Carolina General Statutes, Section 14-127.1] within [Plaintiff's] cell phone and cell phone related data" (Docket Entry 20-8 at 1), Defendant Humphrey described "with[ some] detail[ these] . . . underlying circumstances upon which that belief [wa]s based," <u>Ventresca</u>, 380 U.S. at 108-09 (internal quotation marks omitted):

1) "multiple cases involving graffiti vandalism to buildings owned or controlled by [Defendant UNC-CH occurred] on September 19, 2024" (Docket Entry 20-6 at 1), "includ[ing at] the Naval ROTC Armory" (<u>id.</u>);

2) those "graffiti incidents occurred during a scheduled free speech event that was posted by UNC SJP on their Instagram account encouraging a walk-out to the campus community" (<u>id.</u>); <u>see also</u> <u>id.</u> ("This walk-out occurred at approximately 12:40pm on September 19, 2024."));

3) after the walk-out started, "demonstrators then were guided by known-to-law enforcement UNC SJP members and other community

-44-

organizers to walk into several buildings around the campus of [Defendant] UNC[-CH]" (id.);

4) "[o]ne of these known individuals that was observed by law enforcement was [Plaintiff]" (id.) and Defendant Humphrey "observed [Plaintiff] on multiple university camera systems guiding and directing demonstrators to different buildings where reports of graffiti were taken later" (id. (emphasis added));

5) "at approximately 1:30pm on September 19, 2024, the demonstration made its way to the front doors of the Naval ROTC Armory on the west side of the building" (id.), where "[a] few demonstrators then began to use spray paint cans to create graffiti on the sign, doors and columns of the building" (id.);

6) "[i]n cellphone video obtained by community submissions to law enforcement requests, [Plaintiff] is observed . . . with her phone out and holding it in such a way to record or document the events surrounding what was occurring at the Naval ROTC Armory which included graffiti vandalism to the Naval ROTC Armory" (id.; see also Docket Entry 20-7 at 1 (incorporating "2 images of [Plaintiff] using her phone to support previously stated facts at the Naval ROTC Armory")); and

7) "[i]n [Defendant Humphrey's] training and experience, it is common for people who take pictures and videos to keep them stored on the cellphone and within different cellphone applications" (Docket Entry 20-8 at 1; see also Docket Entry 20-5 at 1

-45-

(describing Defendant Humphrey's 10-plus years of law enforcement experience, as well as his prior and in-service training, to include course-work on "Digital Evidence")).

"[G]iven the low bar of probable cause," Nazario v. Gutierrez, 103 F.4th 213, 229 (4th Cir. 2024), the Court should deem those averments sufficient to support Superior Court Judge Baddour's "practical, common-sense decision . . . [that] there [wa]s a fair probability that . . . evidence of a crime w[ould] be found [on Plaintiff's cellular telephone]," Gates, 462 U.S. at 238, particularly keeping in mind that (A) Defendant Humphrey's "affidavit need not dot every i, cross every t, or . . . close every inferential loop," Orozco, 41 F.3d at 410 (internal quotation marks omitted), (B) "after-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of de novo review," Gates, 462 U.S. at 236 (italics omitted), and (C) Superior Court Judge Baddour's "determination of probable cause should be paid great deference," id. (internal quotation marks omitted).  At the very least, Superior Court Judge Baddour "had a substantial basis for concluding that probable cause existed," id. at 238-39 (internal brackets, ellipsis, and quotation marks omitted)).  The Court therefore should dismiss this sub-claim against Defendant Humphrey, as "the Fourth Amendment requires no more," id. at 236.[15]

_____

[15] A glance at the Supreme Court's description of the sorts of affidavits that fall short of providing the required, minimum "substantial basis for concluding that probable cause existed," Gates, 462 U.S. at 238-39 (internal
(continued...)

-46-

Plaintiff's third (and final) sub-claim for unreasonable search of her cellular telephone against Defendant Humphrey in his individual capacity asserts that "[t]he search warrant was overbroad in violation of the Fourth Amendment's particularity requirement."  (Docket Entry 20 at 23 (standard capitalization applied) (bold font omitted).)  That overbreadth sub-claim focuses on the fact that Defendant Humphrey sought and obtained a warrant authorizing seizure from within Plaintiff's cellular telephone of the entirety of her "internet browser history file and correspondence, including email and messages from various social media platforms . . . ."  (Id. at 24; see also id. at 2 ("The

_____

[15](...continued)
brackets, ellipsis, and quotation marks omitted), underscores the futility of Plaintiff's instant sub-claim challenging Defendant Humphrey's "affidavit [as] reli[ant on] only purely conclusory statements . . . [that] did not establish probable cause" (Docket Entry 20 at 21 (standard capitalization applied) (bold font omitted)).  See Gates, 462 U.S. at 239 (discussing – as examples of "earlier cases illustrat[ing] the limits beyond which a magistrate may not venture in issuing a warrant" – Nathanson v. United States, 290 U.S. 41 (1933), where the affiant simply swore "that 'he has cause to suspect and does believe' that liquor illegally brought into the United States is located on certain premises," as well as Aguilar v. Texas, 378 U.S. 108 (1964), where the affiant averred only to "'receiv[ing] reliable information from a credible person and [to] believ[ing]' that heroin is stored in a home," while labeling those two affidavits as a "wholly conclusory statement" and a "mere conclusory statement," respectively, and jointly as "'bare bones' affidavits").  In contrast to those affidavits (and as detailed above), Defendant Humphrey's affidavit "sets forth not merely some of the underlying circumstances supporting [his] belief [as to probable cause], but a good many of them," Ventresca, 380 U.S. at 109 (internal quotation marks omitted).  In light of that material distinction, acceding to Plaintiff's demand that the Court treat Defendant Humphrey's affidavit as the functional equivalent of the patently deficient affidavits disapprovingly cataloged in Gates and Ventresca would run counter to the Supreme Court's admonition against "[a] grudging or negative attitude by reviewing courts toward warrants [which] will tend to discourage police officers from submitting their evidence to a judicial officer before acting."  Id. at 108; see also Gates, 462 U.S. at 236 ("If the affidavits submitted by police officers are subjected to the type of scrutiny some courts have deemed appropriate, police might well resort to warrantless searches, with the hope of relying on consent or some other exception to the Warrant Clause that might develop at the time of the search.").

-47-

property to be seized in both the affidavit and search warrant contain[s] no temporal restrictions or designations."), 3 ("[T]he search warrant permits UNC Police to search all of [Plaintiff's social media platforms, correspondence, and internet browser history on her cellular telephone] and contains zero temporal restrictions for [the seizure of] this information."), 9-10 (setting out items authorized for seizure in warrant by block-quoting Docket Entry 20-3 at 1), 23-24 (citing authority regarding Fourth Amendment's particularity requirement and objecting to "overly broad nature of the search warrant, specifically the inclusion of email and other messaging platform communications"), 25 (contesting "nexus between facts stated in the affidavit and [Plaintiff's] internet browser file, social media accounts, and electronic correspondence" and alleging that "[n]o reasonable officer . . . would have believed that probable cause existed to justify the seizure of those items").)

Nominally, Defendants' brief seeks dismissal of Plaintiff's entire claim against Defendant Hunphrey for unreasonable search, including the instant, overbreadth sub-claim. (See Docket Entry 26 at 12 (arguing that "Plaintiff's § 1983 claims against Individual Defendants in their individual capacities should be dismissed because they are entitled to qualified immunity."), 14 ("Plaintiff failed to plead facts showing that the Individual Defendants violated her clearly established constitutional rights."), 15

-48-

(noting SAC's inclusion of Section 1983 claims for "violat[ion of (1) Plaintiff's] Fourth Amendment right to be free from unreasonable searches and seizures," (2) "her Fourth Amendment right to be free from excessive force," and (3) her right to freedom from "retaliation for her exercise of her First Amendment rights" and contending that, "as will be explained below, she failed to state a claim for which relief can be granted for all three of her alleged § 1983 claims").)  Yet, in discussing Plaintiff's unreasonable search claim, Defendants' brief <u>only</u> addresses matters that pertain to the first two (of her three) sub-claims, i.e., alleged false statements by Defendant Humphrey in his search warrant affidavit and alleged lack of probable cause in that affidavit to support Defendant Humphrey's belief that Plaintiff's cellular telephone would contain evidence as to graffiti vandalism, without engaging on the overbreadth issue.  (See <u>id.</u> at 16-20.)

Defendants' brief comes closest to confronting the overbreadth sub-claim with the statement that "it was entirely reasonable for Defendant[ Humphrey] to believe that Plaintiff's cell phone might contain evidence of vandalism, <u>including</u> videos, photographs, <u>messages or other data concerning</u> or related to the crime or to <u>possible suspects</u>." (<u>Id.</u> at 19-20 (emphasis added).)  But that one line constitutes too slim a reed to support dismissal of the above-discussed, overbreadth sub-claim against Defendant Humphrey at this stage of the proceeding, most obviously because that line does not

-49-

contend with the lack of any temporal or content-based limits on the warrant's authorization to seize from Plaintiff's cellular telephone all her "[c]orrespondence including, but not limited to electronic mail, chat logs, and/or any electronic messages using applications to include but not limited to Instagram, WhatsApp, Telegram, Signal and/or Facebook" (Docket Entry 20-3 at 1), as well as her entire "[i]nternet browser history file" (id.).[16]

To conclude, the Court should dismiss Plaintiff's Section 1983 claim(s) for an unreasonable search against Individual Defendants in their individual capacities, except for the sub-claim against Defendant Humphrey for obtaining a "search warrant [that] was overbroad" (Docket Entry 20 at 23 (standard capitalization applied) (bold font omitted)).

<u>Section 1983 Claim for Excessive Force<br>and North Carolina Common Law Claims for<br>Battery and Negligent Infliction of Emotional Distress<br>against Individual Defendants in Their Individual Capacities</u>

The SAC asserts a Section 1983 claim "against [Individual] Defendants . . . in their individual capacities" (Docket Entry 20 at 25 (standard capitalization applied) (bold font and italics omitted)), for "excessive force in violation of the Fourth Amendment" (id. (all-caps, bold, and enlarged font omitted)). Per the SAC,

---

[16] Notably, even after Plaintiff's Response presented fairly detailed arguments opposing dismissal of the instant, overbreadth sub-claim (see Docket Entry 29 at 8-9), Defendants did not develop any counter-arguments on that front in their Reply (see Docket Entry 30 at 1-13).

-50-

> [Individual] Defendants violated [Plaintiff's] right to be free from excessive force when they, three grown men, tackled her out of her wheelchair while serving a warrant for evidence of a crime she did not commit and on the basis of behavior that was not a crime, despite them being aware [she] intended to provide them with her cellular device.

(Id. at 26; see also id. at 3 ("Despite the fact that [Individual] Defendants heard and were aware that [Plaintiff] intended to provide [them] with her phone after she turned it off, they declared that turning off the cellular device was destroying evidence and tackled her."), 26 ("At the time [Individual Defendants] utilized excessive force, [Plaintiff] was not committing any crime, was not a threat to the[ir] safety . . ., and [was] not actively resisting or attempting to evade arrest or flee.").) Relatedly, the SAC asserts a claim for "battery" (id. at 35 (all-caps, bold, and enlarged font omitted)), under "North Carolina common law" (id. (standard capitalization applied) (bold font omitted)), "against [Individual] Defendants . . . in their individual capacities" (id. (standard capitalization applied) (bold font and italics omitted)), because they "made intentional and unpermitted physical contact with [Plaintiff]" (id. at 36; see also id. ("Additionally, Defendant Humphrey set in motion a series of events that resulted in [Defendants Dodson and Davis] making intentional and unpermitted contact with Plaintiff's person, which caused [her] cognizable injuries.")).

-51-

In their brief supporting the Dismissal Motion, Individual Defendants argued that, "[b]ecause [they] acted reasonably to avoid the destruction of evidence, Plaintiff's [excessive force] claim should be dismissed." (Docket Entry 26 at 20.) As to battery, they have contended that "public official immunity bars . . . her claim[], and [it] should be dismissed." (Id. at 29; see also id. at 30 ("Plaintiff failed to allege in . . . her claim[ for battery] based on North Carolina common law that [] Individual Defendants acted with malice, corruption, or outside the scope of their authority. Instead, she simply stated that [they] acted 'intentionally' . . . . This is insufficient to overcome public official immunity . . . ." (quoting Docket Entry 20 at 36).)

"A claim that a police officer employed excessive force is analyzed under the Fourth Amendment under an objective reasonableness standard." Smith v. Ray, 781 F.3d 95, 100-01 (4th Cir. 2015) (internal quotation marks omitted). "To properly consider the reasonableness of the force employed, [the Court] must view it in full context, with an eye toward the proportionality of the force in light of all the circumstances." Id. at 101 (internal quotation marks omitted). When doing so, the Court must examine "three factors in particular: 'the severity of the crime at issue, whether the suspect pose[d] an immediate threat to the safety of the officers or others, and whether [s]he [wa]s actively resisting [the officers] or attempting to evade [them] by flight.'" Id.

-52-

(quoting <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989)). "Ultimately, the question to be decided is whether the totality of the circumstances justifies a particular sort of seizure." <u>Id.</u> (internal brackets, ellipsis, and quotation marks omitted).

Because Defendants have challenged Plaintiff's excessive force claim via a Rule 12(b)(6) "motion to dismiss, [the C]ourt must consider the factual allegations in the [SAC] as true and draw all reasonable inferences in favor of [ P]laintiff." <u>Bing v. Brivo Sys., LLC</u>, 959 F.3d 605, 616 (4th Cir. 2020). Viewed from that perspective, the three <u>Graham</u> factors all support the conclusion that the SAC states a viable excessive force claim against Individual Defendants in their individual capacities.

First, regarding "the severity of the crime at issue," <u>Graham</u>, 490 U.S. at 396, the SAC alleges that Individual Defendants encountered Plaintiff for the purpose of "serv[ing] the [search] warrant [for her cellular telephone] on [her] at her dormitory on [Defendant] UNC-CH's campus" (Docket Entry 20 at 3) and the search warrant (as attached to the SAC) shows that it sought evidence of "Graffiti Vandalism" (Docket Entry 20-2 at 1), in violation of "[N.C. Gen. Stat.] § 14-127.1" (<u>id.</u>), "a Class 1 misdemeanor," N.C. Gen. Stat. § 14-127.1(b).[17] Hence, "the crime[] of which

_____

[17] The search warrant application does not state that Defendant Humphrey possessed information indicating that Plaintiff committed graffiti vandalism, just that her cellular telephone held evidence of others' commission of that offense. (<u>See</u> Docket Entry 20-6 at 1; <u>see also</u> Docket Entry 20 at 10 ("There are no allegations in the probable cause affidavit that [Plaintiff] participated, aided, or abetted in any way the graffiti vandalism.").)

-53-

[Individual Defendants] allegedly suspected [Plaintiff to possess evidence] w[as] minor – which means that there was no reason for them to believe that [Plaintiff] . . . would become dangerous." Livingston v. Kehagias, 803 F. App'x 673, 683 (4th Cir. 2020); see also Smith, 781 F.3d at 102 (concluding that, where police officer "at most had reason to suspect that [person encountered] may be guilty of the misdemeanor of contributing to the delinquency of a minor," first Graham factor weighed against officer, as "nonviolent misdemeanor offense was not of the type that would give an officer any reason to believe that [the person encountered] was a potentially dangerous individual").

Second, on the question of "whether [Plaintiff] pose[d] an immediate threat to the safety of [Individual Defendants] or others," Graham, 490 U.S. at 396, the SAC alleges (A) that, "[a]t the time of the incident, [Individual Defendants] knew that [Plaintiff] was a wheelchair user, and therefore physically disabled" (Docket Entry 20 at 26), and (B) that she "was not a threat to the safety of [Individual Defendants, all] grown men that had weapons as well as [] significant height and weight advantages" (id.; see also id. at 13 (describing Individual Defendants as "each weighing well over 180 lbs")). Based on those facts, "[t]he second Graham factor . . . weighs even more strongly in [Plaintiff's] favor," Smith, 781 F.2d at 102. See id. (citing, as weighing against the officer-defendant on second Graham factor, facts that

-54-

he "is a pretty good size man, while [the plaintiff] is a smaller woman" and that he "did not have any reason to believe that [she] was armed" (internal quotation marks omitted)).

Third, the Court must consider "whether [Plaintiff wa]s actively resisting [Individual Defendants] or attempting to evade [them] by flight." Graham, 490 U.S. at 396. As concerns that factor, the SAC alleges the following:

1) "[u]pon orders of [Individual] Defendant[s ], [Plaintiff] exited her dorm room and Defendant Humphrey stated that he needed to read her the warrant" (Docket Entry 20 at 12);

2) "[a]t the time [Plaintiff] exited her dorm room she was on the phone with her legal counsel, Gina Balamucki" (id.; see also id. ("The call was on speaker-phone so both [Plaintiff] and [Individual] Defendant[s ] could hear Attorney Balamucki speaking with [Plaintiff]."));

3) "Defendant Humphrey informed [Plaintiff] that the search warrant was for her cellphone, but explicitly stated that [she] could finish her conversation with her attorney and that her phone would be seized *at the conclusion of that conversation*" (id. (emphasis in original); see also id. at 13 ("Defendant Humphrey also informed [Plaintiff] that her attorney could remain on the phone with [Plaintiff] while he read her the search warrant."));

-55-

4) "[w]ithin seconds of Defendant Humphrey's orders, Attorney Balamucki told [Plaintiff] to hang up the call, turn off her phone, and hand it over to [Individual] Defendant[s ]" (id. at 13);

5) "[b]efore [Plaintiff] could respond to Attorney Balamucki, Defendant Dodson, suddenly and without any warning, stated something to the effect of: 'No, we are not playing these games' and lunged for [Plaintiff's] phone" (id.);

6) "[g]iven the lead officer, Defendant Humphrey, had approximately 30 seconds earlier instructed [Plaintiff] that her phone would be seized after her conversation with her attorney and given that she was still on the phone with her attorney, Defendant Dodson's sudden lunge shocked [Plaintiff]" (id. (emphasis omitted));

7) Individual Defendants then "tackled [Plaintiff] in a manner that threw her from her wheelchair" (id.);

8) Individual Defendants "tackled [Plaintiff] even though they had no indication that [she] did not intend to comply with the search warrant and provide them her phone, and even though all indications from the telephone conversation with [her] attorney were that [Plaintiff] planned to comply" (id.);

9) "[a]fter [Individual] Defendant[s ] were in possession of [Plaintiff's] cellphone and [she] returned to her wheelchair, [they] informed [her that she] had been tackled because her turning off her phone amounted to the destruction of evidence" (id.);

-56-

10) "[n]ever at any point prior to tackling [Plaintiff] did any [Individual] Defendant [] instruct [her to] not turn off her phone, nor did they instruct her that turning off her phone amounted to destroying evidence" (id. at 14);

11) "Defendant Humphrey then charged [Plaintiff] with Resist, Delay, and Obstruct for attempting to destroy evidence by turning off her phone" (id.); and

12) "[a]ny individual with a modicum of understanding about how cellular devices operate would know that turning off a cellphone does not result in the destruction of its contents" (id.; see also id. ("[N]o reasonable officer would think that turning off a cellphone before handing it to the officer constituted an attempt to destroy evidence.")).

Defendants' brief in support of the Dismissal Motion offers this materially different account:

> When Plaintiff emerged from her dorm room, she was using the phone to be seized to call her attorney. After this conversation, Plaintiff appeared to attempt to turn off her cell phone. [Individual Defendants] directed Plaintiff not to do so, as it could destroy potential evidence. When Plaintiff did not comply with [Individual Defendants], they attempted to take the phone from her hands. During the struggle for the phone, Plaintiff fell out of her wheelchair.

(Docket Entry 26 at 4 (internal citations omitted) (citing Docket Entry 20 at 12-13); see also id. at 21 ("[A]s Plaintiff explains in her [SAC], she was attempting to turn off her cell phone in violation of [Individual] Defendants' commands and explanations

-57-

that doing so could destroy evidence." (citing Docket Entry 20 at 3-4)).)  Based on that factual narrative, Individual Defendants argued that their "attempts to seize the phone after Plaintiff disregarded their instructions, despite knowing that doing so may destroy evidence, was reasonable."  (Id. at 21.)

"The flaw with Defendant[s' foregoing] arguments lies with [their] characterization of Plaintiff as noncompliant." Higginbotham v. Brauer, Civ. Action No. 18-1067, 2020 WL 4569520, at *8 (D. Md. Aug. 7, 2020) (unpublished) (internal quotation marks omitted).  Put another way, "Defendant[s] fail[] to construe the facts in Plaintiff's favor, and doing so reveals that [she] did not actively or passively resist [Individual Defendants] or otherwise disregard [their] orders during the [incident]."  Id.  For instance, Defendants' account relies on the assertions (A) that, "[a]fter [Plaintiff's] conversation [with her attorney], Plaintiff appeared to attempt to turn off her cell phone" (Docket Entry 26 at 4), whereupon "[Individual Defendants] directed Plaintiff not to do so, as it could destroy potential evidence" (id.), and (B) that, only "[w]hen Plaintiff did not comply" (id.), did "they attempt[] to take the phone from her hands" (id.; see also id. at 21 (asserting that "[Plaintiff] was attempting to turn off her cell phone in violation of [Individual Defendants'] commands and explanations that doing so could destroy evidence" and that they only "attempt[ed] to seize the phone after Plaintiff disregarded

-58-

their instructions")). But the SAC expressly alleges that Defendant Dodson "lunged for [Plaintiff's] phone" (Docket Entry 20 at 13), while "she was still on the phone with her attorney" (id.), and that "[n]ever at any point prior to tackling [Plaintiff] did any [Individual] Defendant [] instruct [her to] not turn off her phone, nor did they instruct her that turning off her phone amounted to destroying evidence" (id. at 14; see also id. at 13 (alleging that only "[a]fter [Individual] Defendant[s ] were in possession of [Plaintiff's] cellphone and [she] returned to her wheelchair" did they "inform[ her she] had been tackled because her turning off her phone amounted to the destruction of evidence")).

Crediting Plaintiff's allegations, as the Court must at this juncture, see Bing, 959 F.3d at 616, she "was not 'actively resisting,'" Livingston, 803 F. App'x at 684 (quoting Graham, 490 U.S. at 396). More to the point,

> on [Plaintiff's] account of events, . . . [she] was offering no resistance of any kind, passive or otherwise, . . . [when s]he was forcibly [tackled] from h[er wheelchair] and taken to the ground by [Individual Defendants] – a level of force that by itself has been deemed constitutionally excessive when deployed against a stationary individual suspected of only a misdemeanor.

Id. (emphasis omitted). Returning to the Graham factors as a whole, "[o]n the record as [the Court must view it] . . ., [Individual Defendants] were faced with an individual who [held evidence of] . . . minor offenses; did not attempt to attack the[m ]; was not and did not appear to be armed; and offered no

-59-

resistance . . . [but nonetheless] she was suddenly [tackled] to the ground . . . ."  Id.

Overall, "the mismatch here between [Plaintiff's conduct] and [Individual Defendants'] response is great enough to render the[ir] actions unnecessary, gratuitous, and disproportionate in violation of the Fourth Amendment."  Id. (internal quotation marks omitted); see also, e.g., Horowitz v. Sherman, Civ. Action No. 19-2459, 2020 WL 5339843, at *4 (D. Md. Sept. 4, 2020) (unpublished) ("Tackling a non-threatening, non-resisting individual to the ground does allege a Fourth Amendment excessive force claim."). The Court therefore should allow Plaintiff's Section 1983 claim for excessive force in violation of the Fourth Amendment to proceed.[18]

_____

[18] In arguing for dismissal based on qualified immunity of all the SAC's Section 1983 claims against Individual Defendants in their individuals capacities, Defendants state in conclusory fashion that "Plaintiff failed to provide the Court with any caselaw showing that . . . Individual Defendants' alleged wrongful actions . . . preventing Plaintiff from potentially destroying electronic evidence . . . were violations of her clearly established rights." (Docket Entry 26 at 14.)  As with Defendants' argument above, that framing relies on their version of events rather than the version of events alleged in the SAC and thus cannot provide a basis for dismissal under Rule 12(b)(6).  See Jenkins v. Medford, 119 F.3d 1156, 1159 (4th Cir. 1997) (en banc) (holding that assessment of "motion to dismiss based on qualified immunity" requires "accept[ing] as true the facts alleged in the complaint, and view[ing] those facts in the light most favorable to the nonmoving party").  Further, under the SAC's recitation of the facts, Individual Defendants' qualified immunity defense would fail.  See Livingston, 803 F. App'x at 684 ("Since at least 1994, when [the Fourth Circuit] decided Rowland v. Perry, 41 F.3d 167 (4th Cir. 1994), it has been clearly established that serious physical force . . . is constitutionally excessive when used against an individual suspected, at most, of a minor crime, who is unarmed, and who does not attempt to flee or physically attack the officer – even if the suspect offers passive resistance . . . ."); Barfield v. Kershaw Cnty. Sheriff's Off., 638 F. App'x 196, 203 (4th Cir. 2016) ("[T]he law at the time of [the defendant-officer's] conduct makes clear that in November 2011, a police officer's unprovoked tackling of a nonthreatening, nonresisting misdemeanor suspect . . . violates the Fourth Amendment."); Higginbotham, 2020 WL 4569520, at *7 ("At the time of [the d]efendant's conduct [in 2015], it was clearly established that a police officer's tackling to the ground a non-threatening, nonresisting, misdemeanor suspect violates the Fourth Amendment.");
(continued...)

-60-

North Carolina law also recognizes "a civil action for damages for assault and battery . . . against [a law enforcement officer] who, for the accomplishment of a legitimate purpose . . ., uses force which is excessive under the given circumstances." <u>Myrick v. Cooley</u>, 91 N.C. App. 209, 215, 371 S.E.2d 492, 496 (1988); <u>see also id.</u> ("Under the common law, a law enforcement officer has the right . . . to use only such force as may be reasonably necessary to overcome any resistance and properly discharge [the officer's] duties."). On the other hand, under North Carolina's doctrine of public official immunity, "an official may not be held liable [u]nless it be alleged and proved that [the official's] act, or

---

[18](...continued)
<u>see also</u> <u>Smith</u>, 781 F.3d at 106 ("[T]he weakness of the *Graham* factors was so apparent that any reasonable officer would have realized that the force employed was excessive."). "[The] conclusion that [Individual Defendants are] not entitled to qualified immunity at this stage is no indictment of [them, as they evidently] den[y] many of the facts on which [Plaintiff's excessive force] claim is based." <u>Smith</u>, 781 F.3d at 106. At this moment, however, the Court cannot "decide whose version of facts is correct." <u>Id.</u> "There is a difference, however, between viewing the facts alleged in the [SAC] as true for purposes of [the] review of [a] Rule 12(b)(6) motion and improperly representing facts to the Court that counsel [or Plaintiff] knows to be false." <u>Cook v. Howard</u>, 484 F. App'x 805, 821 n.16 (4th Cir. 2012). Notably, Plaintiff has stated that "this entire interaction is recorded on [Individual] Defendants' body camera video, including the commands given (or not given), and that it may be reviewed by the Court at the appropriate phase of the litigation (i.e., summary judgment and/or trial)." (Docket Entry 29 at 16.) If that or other conclusive evidence disproves the factual allegations in the SAC about Plaintiff's conduct and/or Individual Defendants' conduct, Plaintiff and/or her counsel may well have some explaining to do. <u>See</u> Fed. R. Civ. P. 11(b) ("By presenting to the court a pleading . . . or other paper – whether by signing, filing, submitting, or later advocating it – an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances . . . the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . ."); Fed. R. Civ. P. 12(c)(1) ("If, after notice and a reasonable opportunity to respond, the court determines that Rule 11(b) has been violated, the court may impose an appropriate sanction on any attorney, law firm, or party that violated the rule or is responsible for the violation.").

failure to act, was corrupt or malicious . . ., or that [the official] acted outside of and beyond the scope of [the official's] duties." Smith v. State, 289 N.C. 303, 331, 222 S.E.2d 412, 430 (1976) (internal quotation marks omitted). But, "public officers' immunity . . . is unavailable to officers who violate clearly established rights because an officer acts with malice when he does that which a man of reasonable intelligence would know to be contrary to his duty." Bailey v. Kennedy, 349 F.3d 731, 742 (4th Cir. 2003) (internal footnote and quotation marks omitted).

"The threshold for determining whether the limits of privileged force have been exceeded for purposes of liability under Section 1983 is higher than that for a normal tort action." Myrick, 91 N.C. App. at 215, 371 S.E.2d at 496 (internal citation omitted). Thus, "[w]here a plaintiff brings both a [Section] 1983 excessive force claim and a common law claim for assault and battery, the [C]ourt's determination of the reasonableness of the force used with respect to the [Section] 1983 claim controls its assault and battery analysis," 6 Am. Jur. 2d Assault and Battery § 96 (2025) (internal footnote omitted), at least insofar as constitutionally excessive force will establish a battery. See Johnston v. Hefner, No. 5:24CV138, 2025 WL 2417760, at *9 (W.D.N.C. July 16, 2025) (unpublished) ("The Fourth Circuit has recognized that 'the jurisprudence governing Fourth Amendment excessive force actions also controls a party's actions for battery . . . .'"

-62-

(stray comma omitted) (quoting <u>Njang v. Montgomery Cnty.</u>, 279 F. App'x 209, 216 (4th Cir. 2008))). Because the facts alleged in the SAC not only support Plaintiff's Section 1983 claim for excessive force against Individual Defendants but (for reasons detailed in Footnote 18) also evince a violation of her clearly established rights that vitiates (at this stage) their defense of public official immunity, Plaintiff's "parallel state law claim of . . . battery[, which] is subsumed within the federal excessive force claim[, should] go[] forward," <u>Rowland v. Perry</u>, 41 F.3d 167, 174 (4th Cir. 1994). <u>See</u> <u>Bailey</u>, 349 F.3d at 742 & n.6 (affirming ruling against the defendant-officers at summary judgment on their defense of public official immunity to the plaintiff's state-law claims, where record, when viewed in light most favorable to the plaintiff, supported finding that the defendant-officers violated the plaintiff's clearly established rights).

The same result obtains on Plaintiff's claim for "negligent infliction of emotional distress" (Docket Entry 20 at 36 (all-caps, bold, and enlarged font omitted)), under "North Carolina common law" (<u>id.</u> (standard capitalization applied) (bold font omitted)), "against [Individual] Defendants . . . in their individual capacities" (<u>id.</u> (bold font and italics omitted)), <u>to the extent</u> that claim relies on the allegation that Individual Defendants' "seiz[ure of Plaintiff's] cellphone [in a manner which] caus[ed] her physical injury through the excessive use of force . . . in

-63-

violation of her Fourth Amendment rights" (<u>id.</u> at 36-37) "did, in fact, cause [her] severe emotional distress and mental anguish" (<u>id.</u> at 37).  <u>See</u> <u>Russ v. Causey</u>, 468 F. App'x 267, 273 (4th Cir. 2012) ("It is not the elements of the claim that determine whether a public official is entitled to public officer's immunity. Rather, it is whether the facts alleged are sufficient to pierce the cloak of immunity, so as to strip the official of that immunity and allow plaintiffs to sue the official as if the suit had been brought against 'any private individual.'" (some internal quotation marks omitted) (quoting <u>Prior v. Pruett</u>, 143 N.C. App. 612, 619, 550 S.E.2d 166, 171 (2001))); <u>see also</u> <u>Freeman v. Sanchez</u>, No. 1:24CV414, 2025 WL 2411036, at *12-13 (M.D.N.C. Aug. 20, 2025) (Schroeder, J.) (rejecting public official immunity defense to negligent infliction of emotional distress claim, including contention that "negligent infliction of emotional distress [claim] alleges only negligence and is therefore barred by official immunity," where the plaintiffs "offered proof of malice," namely facts that "could allow a jury to conclude that [the defendant] acted maliciously in needlessly shooting [the plaintiffs' dog]").[19]

---

[19] Defendants also sought dismissal of Plaintiff's negligent infliction of emotional distress claim against Individual Defendants in their individual capacities on the theory that, under North Carolina's Tort Claims Act, she must pursue such claim(s) in the North Carolina Industrial Commission.  (<u>See</u> Docket Entry 26 at 31.)  That contention lacks merit.  As the North Carolina Supreme Court has repeatedly held, "'the fact that [North Carolina's] Tort Claims Act provides for subject matter jurisdiction in the Industrial Commission over a negligence claim against the State does not preclude a claim against [individual] defendants in [a c]ourt.'"  <u>Estate of Long by & through Long v. Fowler</u>, 378 N.C. 138, 145, 861 S.E.2d 686, 693 (2021); <u>see also, e.g.</u>, <u>Wirth v. Bracey</u>, 258 N.C.
(continued...)

-64-

Accordingly, the Court should deny the Dismissal Motion as to Plaintiff's Section 1983 claim(s) against Individual Defendants in their individual capacities for excessive force, as well as her North Carolina common law claims for battery and negligent infliction of emotional distress based on use of excessive force.

<u>Section 1983 Claim for Retaliation against
Individual Defendants in Their Individual Capacities</u>

For Plaintiff's final Section 1983 claim against Individual Defendants in their individual capacities, the SAC alleges "retaliation in violation of the First Amendment." (Docket Entry 20 at 33 (all-caps, bold, and enlarged font omitted).) That claim rests on the allegation that Plaintiff "was targeted for a search warrant because she attended a free speech event and recorded while present at this event on [sic] located on a public sidewalk." (<u>Id.</u> at 34; <u>see also</u> <u>id.</u> at 34-35 (alleging that "th[o]se activities are First Amendment protected activities," as well as that "[Individual] Defendants' actions in subjecting [Plaintiff] to a highly invasive, broad violation of her privacy when she was not accused of participating in the alleged graffiti vandalism . . . adversely affected her First Amendment rights" and "subjected [her] to humiliation and emotional distress").) As grounds for dismissal

---

[19](...continued)
505, 507–08, 128 S.E.2d 810, 813 (1963) ("The only claim authorized by [North Carolina's] Tort Claims Act is a claim against the State agency. True, recovery, if any, must be based upon the actionable negligence of an employee of such agency while acting within the scope of his employment. However, recovery, if any, against the alleged negligent employee must be by common law action.").

-65-

of this claim, Defendants' brief argues that "Plaintiff has not alleged sufficient facts to show that the request for a search warrant of her phone was a pretext to retaliate against her for protesting on campus beyond her own unfounded assumption and conclusion." (Docket Entry 26 at 23-24.) A recent Fourth Circuit decision confirms that the SAC's allegations do not suffice and the Court therefore should dismiss this claim.

"To state a First Amendment retaliation claim [against Individual Defendants], [ P]laintiff must plead that she engaged in protected First Amendment activity, [Individual D]efendants took some action that adversely affected her First Amendment rights, and there was a causal relationship between her protected activity and [Individual D]efendants' conduct." Stanley v, Bocock, 160 F.4th 573, 577 (4th Cir. 2025) (internal quotation marks omitted). Years ago, the Supreme Court ruled that "[a] plaintiff must plead the absence of probable cause to survive a motion to dismiss in retaliatory prosecution and arrest cases." Id. (emphasis added) (internal quotation marks omitted) (quoting Nieves v. Bartlett, 587 U.S. 391, 404 (2019), and Hartman v. Moore, 547 U.S. 250, 263 (2006)); see also id. (explaining that "probable cause makes it nearly impossible to show that animus caused the adverse action"). The Supreme Court has carved out but one "exception to this rule," id., for claims in which "'a plaintiff presents objective evidence that [s]he was arrested [or prosecuted] when otherwise similarly

-66-

situated individuals not engaged in the same sort of protected speech had not been.'" Id. (quoting Nieves, 587 U.S. at 407).

In Stanley, the Fourth Circuit held that the probable-cause requirement from Hartman and Nieves "extends to First Amendment-based retaliatory search claims." Id. at 578. Applying that requirement to the facts of that case, the Fourth Circuit (A) ruled that "merely reciting the absence of probable cause, without more, doesn't cut it," id. at 579, while (B) reiterating that "it doesn't matter 'whether the target of the search is suspected of a crime,'" id. (quoting Lalor, 996 F.2d at 1582), and (C) declaring that "a [Section] 1983 lawsuit isn't the forum to micromanage investigative techniques," id., in response to the plaintiff's contention that the search warrants at issue "lacked probable cause because other places [besides the plaintiff's social media and e-mail accounts covered by those search warrants] were more likely to contain evidence of the supposed [crime]," id. at 579 n.5; see also id. ("Whether other places would have been better search targets has no bearing on whether probable cause supported this search."). The Fourth Circuit then dispatched the plaintiff's retaliation claim as follows: "Neutral magistrates found that probable cause supported each warrant. We can't conclude that they acted unreasonably in so finding. In short, [the plaintiff] didn't plead the absence of probable cause. The district court thus properly dismissed the First Amendment retaliation claim." Id. at

-67-

579; <u>see also</u> <u>id.</u> (emphasizing duty of courts to "give 'great deference' to a magistrate judge's probable cause findings" (quoting <u>Gates</u>, 462 U.S. at 236)).[20]

Likewise here, for reasons detailed in the prior section addressing Plaintiff's unreasonable search claim, the SAC does <u>not</u> plead sufficient facts to show that the search warrant for her cellular telephone lacked probable cause. Under <u>Stanley</u>, Plaintiff's retaliation claim therefore fails as a matter of law, unless the SAC satisfies "the 'objective evidence' exception," <u>id.</u> at 578 (quoting <u>Nieves</u>, 587 U.S. at 407), "[a]ssuming it applies to retaliatory search claims," <u>id.</u> The SAC, however, does not allege, much less provide "objective evidence[,] that [Plaintiff's property] was [searched] when [the property of] otherwise similarly situated individuals not engaged in the same speech had not been," <u>id.</u> (internal quotation marks omitted). (<u>See, e.g.</u>, Docket Entry 20 at 6-14 (including no such factual matter in "Factual Allegations" section of SAC (all-caps, bold, and enlarged font, as well as underscoring, omitted)), 33-35 (including no such factual matter in allegations for retaliation claim).) Under these

---

[20] The Fourth Circuit "[a]ssum[ed] <u>Nieves</u>'s objective evidence exception] applies to retaliatory search claims," <u>Stanley</u>, 169 F.4th at 578, but concluded that the plaintiff failed to "satisfy it," <u>id.</u>, despite the presence of "a statement in the warrant application about [the plaintiff's] disdain for [his local p]olice [d]epartment," <u>id.</u> (internal quotation marks omitted). In reaching that conclusion, the Fourth Circuit emphasized that courts "have no license to ignore a finding of probable cause merely because a plaintiff can muster some evidence a government official acted with improper motives." <u>Id.</u> (emphasis omitted); <u>see also</u> <u>id.</u> ("The Supreme Court has applied the exception only for rarely or never prosecuted crimes.").

-68-

circumstances, the Court should dismiss Plaintiff's Section 1983 claim for retaliation against Individual Defendants in their individual capacities.[21]

### Americans with Disabilities Act and Rehabilitation Act Claims against Defendant UNC-CH and Individual Defendants in Their Official Capacities

Plaintiff's final federal claims in the SAC arise under the Americans with Disabilities Act ("ADA") (see Docket Entry 20 at 27-31) and Section 504 of the Rehabilitation Act (see id. at 31-33). For both such claims, Plaintiff seeks relief "[a]gainst Defendant UNC[-]CH and Defendants Humphrey, Dodson, and Davis in their official capacities." (Id. at 27, 31 (bold font and italics omitted).) Plaintiff's ADA claim consists of two sub-claims: (1) "Defendants Humphrey, Dodson, and Davis seized [her] cellphone in a manner that did not reasonably accommodate [her] disability" (id. at 28 (standard capitalization applied) (bold font omitted)); and (2) "Defendants intentionally discriminated against [her] when they sought a search warrant of [her] cellphone because of her disability" (id. at 30 (standard capitalization applied) (bold font omitted)). In parallel fashion, the SAC alleges violations of

---

[21] The Court "needn't reach qualified immunity because [Plaintiff] failed to state a claim." Stanley, 160 F.4th at 579 n.6. However, the Court may wish to note that, as with her unreasonable search claim, Plaintiff asserted this retaliation claim (premised on the acquisition of the search warrant for her cellular telephone) against Defendants Dodson and Davis, despite the fact that the SAC does not allege that they played any role in acquiring the search warrant (but instead alleges that Defendant Humphrey alone acquired it). (See, e.g., Docket Entry 20 at 1-14 (introductory sections), 15-25 (unreasonable search claim section), 33-35 (retaliation claim section).) Once more then, it appears that Plaintiff's counsel has violated Federal Rule of Civil Procedure 11(b), by asserting claims against Defendants Dodson and Davis without any colorable basis.

-69-

Section 504 of the Rehabilitation Act for (A) "discriminat[ion ] when [Individual] Defendant[s ] knocked [Plaintiff] from her wheelchair while executing a search warrant, despite the fact that she was not committing any crime and they were aware of her disability" (id. at 32), and (B) "discriminat[ion ] because she was denied the ability to participate in a student organization's activity, specifically a free speech event on campus, without her disability making her a target for law enforcement" (id. at 33).

Regarding those claims, Defendants' brief in support of the Dismissal Motion argues, as a threshold matter, that Plaintiff's "ADA and Rehabilitation Act claims against [] Individual Defendants in their official capacities . . . should be dismissed as duplicative of the claims against [Defendant] UNC-CH." (Docket Entry 26 at 24 n.4 (citing Armstrong v. City of Greensboro, 190 F. Supp. 3d 450, 463 (M.D.N.C. 2016) (Osteen, J.) (recognizing that "duplicative claims against an individual in his official capacity when the government entity [employing that individual] is also sued may be dismissed")).) Plaintiff did not contest that argument in her Response. (See Docket Entry 29 at 20-23 (discussing ADA and Rehabilitation Act claims without addressing said argument).) "Any judgment rendered against [Individual Defendants] in [their] official capacit[ies] as [employees] of [Defendant UNC-CH] would be tantamount to a judgment against [Defendant UNC-CH] itself. Thus, the Court [should] dismiss[] the ADA and [Section] 504 claims

-70-

against [Individual] Defendant[s ] in [their] official capacit[ies]." Estate of Valentine, by and through Grate v. South Carolina, 611 F. Supp. 3d 99, 113 (D.S.C. 2019); accord, e.g., Smith v. North Carolina Dep't of Public Safety, No. 1:21CV202, 2022 WL 258533, at *2 (W.D.N.C. Jan. 26, 2022) (unpublished); Latson v. Clarke, 249 F. Supp. 3d 838, 855-56 (W.D. Va. 2017).

Moving on to the substance of Plaintiff's intertwined ADA and Rehabilitation Act claims for failure to reasonably accommodate her disability premised on Individual Defendants' act(s) of tackling her from her wheelchair while serving the search warrant (hereinafter denominated as the "Tackling Sub-Claim"), Defendants' brief supporting the Dismissal Motion first faults Plaintiff for "primarily rel[ying] upon three cases in support of [the Tackling Sub-C]laim" (Docket Entry 26 at 26 (referring to Sheehan v. City & Cnty. of San Francisco, 743 F.3d 1211 (9th Cir. 2014), aff'd in part and rev'd in part, 575 U.S. 600 (2015), Waller v. City of Danville, 556 F.3d 171 (4th Cir. 2009), and A.G. v. Fattaleh, 614 F. Supp. 3d 204 (W.D.N.C. 2022))),[22] because "those cases are only

_____

[22] The SAC first quotes from the last of those three decisions to show both the general elements necessary "[t]o establish a claim under the ADA" (Docket Entry 20 at 27 (quoting A.G., 614 F. Supp. 3d at 240-41)) and the "'three distinct grounds for relief [available under Title II of the ADA]'" (id. (quoting A.G., 614 F. Supp. 3d at 241)). Next, the SAC cites the above-referenced Fourth Circuit decision for the proposition "that searches and seizures by local police departments are governed by the ADA." (Id. at 28-29 (citing Waller, 556 F.3d at 174).) Finally, the SAC cites the remaining (out-of-circuit) decision as support for the assertion that "[i]ndividuals suffer disability-based discrimination when police, acting with knowledge of the person's disability, effectuate their seizure in a way that does not reasonably accommodate their disability." (Id. at 29 (citing Sheehan, 743 F.3d at 1232).)

-71-

applicable when law enforcement officers are <u>effectuating an arrest</u>" (<u>id.</u> (emphasis added); <u>see also</u> <u>id.</u> ("Plaintiff did not allege that she was arrested on September 27, 2024. Instead, [Individual] Defendants were simply serving her with a legal search warrant signed by a judge.")). As Plaintiff's Response points out, the Fourth Circuit decision in question appears to sweep more broadly than Defendants have contended. (<u>See</u> Docket Entry 29 at 22 (parenthetically quoting language from <u>Waller</u>, 556 F.3d at 174, for its reference to requirement under ADA "to accommodat[e] disability during 'an <u>investigation</u> or arrest'" (emphasis added)).)

In any event, another Fourth Circuit decision, <u>Seremeth v. Board of Cnty. Com'rs Fredrick Cnty.</u>, 673 F.3d 333 (4th Cir. 2012) – also cited in the SAC (<u>see</u> Docket Entry 20 at 29) – explicitly "conclude[s] that the ADA applies to the <u>investigation of criminal conduct</u>," <u>Seremeth</u>, 673 F.3d at 339 (emphasis added).[23] Further, by Defendants' own admission, the service of the search warrant on Plaintiff constituted part of the "investigation" (Docket Entry 26 at 4) into "<u>criminal activity</u> when the Naval ROTC Armory . . . was defaced and sprayed with graffiti" (<u>id.</u> at 3-4 (emphasis added) (citing N.C. Gen. Stat. § 14-127.1)). Given that admission and

---

[23] Defendants have construed "Fourth Circuit [caselaw as <u>both</u>] h[o]ld[ing] that the ADA and the Rehabilitation Act are substantially similar, <u>and</u> . . . appl[ying] the same analysis under both laws." (Docket Entry 26 at 25 (emphasis added) (citing <u>Baird v. Rose</u>, 192 F.3d 462, 468 (4th Cir. 1999) (citing <u>Doe v. University of Md. Med. Sys. Corp.</u>, 50 F.3d 1261, 1264 n.9 (4th Cir. 1995)))).) Based on that construction, the Fourth Circuit's above-quoted pronouncement about the ADA's applicability to criminal investigations should inform the Court's understanding of the proper scope of the Rehabilitation Act.

<u>Seremeth</u>'s clear language, the Court should <u>not</u> dismiss the Tackling Sub-Claim simply because it arose in the context of a criminal investigation rather than an arrest.

Defendants' final argument for dismissal of the Tackling Sub-Claim takes this form:

> [I]n [the SAC, Plaintiff] revealed that she was disobeying a directive from [Individual] Defendants by attempting to turn off her cell phone. In addition, Plaintiff revealed that she was aware that doing so could destroy evidence. These facts belie Plaintiff's conclusion that Defendants failed to accommodate her. Instead, [Individual] Defendants acted reasonably to gather and preserve possible evidence of a crime, and Plaintiff's [Tackling Sub-C]laim should be dismissed.

(<u>Id.</u> at 26-27 (internal citations omitted) (citing Paragraphs 10 and 11 of SAC).)

The paragraphs of the SAC cited by Defendants to support that argument allege as follows:

> 10. On September 27, 2024, Defendants Humphrey, Dodson, and Davis served the search warrant on [Plaintiff] at her dormitory on [Defendant] UNC[-]CH's campus.
>
> 11. At the time the warrant was served, [Plaintiff] was speaking with her counsel on speaker phone who advised her to turn off the cellular device and provide it to [Individual] Defendants. Despite the fact that [Individual] Defendants heard and were aware that [Plaintiff] intended to provide [Individual] Defendants with her phone after she turned it off, they declared that turning off the cellular device was destroying evidence and tackled her.

(Docket Entry 20 at 3.)

"In considering a motion to dismiss, the [C]ourt . . . should view the [SAC] in a light most favorable to [ P]laintiff." <u>Mylan</u>

-73-

Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). Viewed in that light, the SAC's above-quoted language does not admit that Plaintiff "was disobeying a directive from [Individual] Defendants by attempting to turn off her cell phone" (Docket Entry 26 at 26 (emphasis added)); rather, it discloses only that Plaintiff's counsel "advised [Plaintiff] to turn off the cellular device" (Docket Entry 20 at 3 (emphasis added)), that she "intended to provide [them] with her phone after she turned it off" (id. (emphasis added)), and that – at some point (perhaps just after Plaintiff's counsel advised Plaintiff to turn off her cellular telephone before providing it to Individual Defendants and just before they tackled her) – "they declared that turning off the cellular device was destroying evidence" (id.).

Moreover, Defendants' argument based on Paragraphs 10 and 11 of the SAC ignores this more fulsome description of the salient events, which Plaintiff also included in the SAC:

> On September 27, 2024, Defendants Humphrey, Dodson, and Davis . . . served [Plaintiff] with the search warrant at her dormitory located on [Defendant] UNC[-]CH's campus.
>
> Upon orders of [Individual] Defendant[s ], [Plaintiff] exited her dorm room and Defendant Humphrey stated that he needed to read her the warrant.
>
> At the time [Plaintiff] exited her dorm room she was on the phone with her legal counsel, Gina Balamucki. The call was on speaker-phone so both [Plaintiff] and [Individual] Defendant[s ] could hear Attorney Balamucki speaking with [Plaintiff].

-74-

Defendant Humphrey informed [Plaintiff] that the search warrant was for her cellphone, but explicitly stated that [she] could finish her conversation with her attorney and that her phone would be seized at the conclusion of that conversation.

Defendant Humphrey also informed [Plaintiff] that her attorney could remain on the phone with her while he read her the search warrant.

Within seconds of Defendant Humphrey's orders, Attorney Balamucki told [Plaintiff] to hang up the call, turn off her phone, and hand it over to [Individual] Defendant[s ].

Before [Plaintiff] could respond to Attorney Balamucki, Defendant Dodson, suddenly and without any warning, stated something to the effect of: "No, we are not playing these games" and lunged for [Plaintiff's] phone.

Given the lead officer, Defendant Humphrey, had approximately 30 seconds earlier instructed [Plaintiff] that her phone would be seized after her conversation with her attorney and given that she was still on the phone with her attorney, Defendant Dodson's sudden lunge shocked [Plaintiff].

The three men, each weighing well over 180 lbs, tackled [Plaintiff] in a manner that threw her from her wheelchair. They tackled her even though they had no indication that [Plaintiff] did not intend to comply with the search warrant and provide them her phone, and even though all indications from the telephone conversation with the attorney were that [Plaintiff] planned to comply.

In addition to causing [Plaintiff] physical injury, this action also led to damage to [Plaintiff's] very expensive wheelchair and to the heavy wheelchair falling on top of [Plaintiff].

After [Individual] Defendant[s ] were in possession of [Plaintiff's] cellphone and [she] returned to her wheelchair, [Individual] Defendant[s ] informed [her that she] had been tackled because her turning off her phone amounted to the destruction of evidence.

-75-

> Never at any point prior to tackling her did any [Individual] Defendant [] instruct [Plaintiff to] not turn off her phone, nor did they instruct her that turning off her phone amounted to destroying evidence.

(Id. at 12-14 (emphasis added) (original emphasis and internal paragraph numbers omitted).)

"[V]iew[ing] th[at portion of the SAC] in a light most favorable to [ P]laintiff," Mylan Labs., 7 F.3d at 1134, and "draw[ing] all reasonable inferences in [her] favor," Bing, 959 F.3d at 616, the factual allegations in the SAC do not compel the conclusion that "[Individual] Defendants acted reasonably to gather and preserve possible evidence of a crime" (Docket Entry 26 at 27 (emphasis added)). As such, Defendants (at least thus far) have shown neither that the SAC's factual allegations "belie Plaintiff's conclusion that [Individual] Defendants failed to [reasonably] accommodate her [disability]" (id.) nor that "Plaintiff's [Tackling Sub-C]laim should be dismissed" (id.). Whether Individual Defendant's alleged conduct when serving the search warrant violated the ADA and/or the Rehabilitation Act remains an open question, but the challenges Defendants have proffered to date do not entitle them to judgment as a matter of law on such claims.

The SAC's second (and final) sub-claim under the ADA and the Rehabilitation Act asserts that, "[i]n addition to failing to reasonably accommodate [Plaintiff] in the provision of police services [during the service of the search warrant], Defendant[ UNC-CH] also intentionally discriminated against [her] when [it]

-76-

impeded her ability to participate in university programs and activities by targeting her because of her disability." (Docket Entry 20 at 30.) According to the SAC, the discriminatory, disability-based targeting of Plaintiff (hereinafter, the "Targeting Sub-Claim") occurred as follows:

> Among dozens, if not hundreds, of individuals participating in [protest] activity organized by a registered student organization that received university funding, [Plaintiff] was targeted for a search warrant, not because she participated or aided criminal activity, but because her disability allowed law enforcement to identify her when they could not identify anyone else.

(Id.; see also, e.g., id. at 11 ("[Defendant Humphrey] sought access to [Plaintiff's cellular telephone] because she is a wheelchair user and therefore she was easily identifiable to [the] UNC[-CH police department] as a member of the crowd [in the area of the Naval ROTC Armory]." (stray comma omitted)), 31 ("[Defendant] UNC[-]CH is vicariously liable for [the Targeting Sub-Claim] . . . because the [discrimination] occurred while [Defendant Humphrey ] act[ed] within the scope of [his] employment and [Defendant] UNC[-]CH has control over officers employed with [Defendant UNC-CH]."), 33 ("[Plaintiff] was discriminated against [in violation of the Rehabilitation Act] because she was denied the ability to participate in a student organization's activity, specifically a free speech event on campus, without her disability making her a target for law enforcement.").)

-77-

Defendants have requested dismissal of the Targeting Sub-Claim on the ground that Plaintiff "failed to allege sufficient facts to state a claim upon which relief can be granted." (Docket Entry 26 at 27.) More pointedly, per Defendants: "[N]either the ADA nor the Rehabilitation Act require law enforcement officials to pretend not to recognize individuals they are familiar with just because the individual has a disability." (Id. at 28.) Defendants argued "[f]urther[ that] Plaintiff failed to credibly allege that she will be prevented from participating in future free speech events" (id.), as the asssertion "[t]hat [Plaintiff] will be served with a search warrant for her cell phone after every free speech event she attends in the future is a conclusion for which the [SAC] provides no support" (id. at 28-29).

Plaintiff's Response does not meaningfully engage with those persuasive arguments by Defendants; rather, it veers back into her challenge to the sufficiency of the probable cause showing for the search warrant, which (for reasons discussed at length in the prior section addressing her unreasonable search claim) misses the mark. (See Docket Entry 29 at 23 ("Defendants have never alleged that [Plaintiff] was involved in the graffiti incident. She was not involved in the graffiti incident, and it occurred after her event was finished; she did not film it." (emphasis added) (internal citations and quotation marks omitted)).) To the extent the Response offers any rejoinder to Defendants' above-quoted points,

-78-

it relies on an assertion which lacks any citation to (or apparent foundation in) the SAC:  "Law enforcement did not seize and search the cell phones of any other participant at the event; only the visibly-disabled [Plaintiff] suffered the indignity and inconvenience of having her device . . . searched."  (Id.)

Not only does that assertion appear to stray beyond the four corners of the SAC, but it also (A) distorts the critical balance between the rights and responsibilities of citizenship, and (B) conflicts with the objectives of the ADA and the Rehabilitation Act.  "[A] central purpose of the ADA . . . is to promote the integration of disabled individuals into society . . . ."  Project Life, Inc. v. Glendening, 46 F. App'x 147, 151 (4th Cir. 2002) (citing 42 U.S.C.A. § 12101(a)(2), (8)); see also National Fed'n of the Blind, Inc. v. Lamone, Civ. Action No. 14-1631, 2014 WL 4388342, at *12 (D. Md. Sept. 4, 2014) (unpublished) (listing "inclusion and integration into society" among "purpose[s] of the Rehabilitation Act" (internal quotation marks omitted)), aff'd, 813 F.3d 484 (4th Cir. 2016).  Full participation in American society requires disabled individuals to bear the same obligations all members of society must bear, which includes providing evidence under the law:  "For more than three centuries it has now been recognized as a fundamental maxim that the public . . . has a right to every man's [or woman's] evidence."  United States v. Bryan, 339 U.S. 323, 331 (1950) (internal quotation marks omitted); see also

-79-

<u>Trump v. Vance</u>, 591 U.S. 785, 791 (2020) ("In our judicial system, the public has a right to every man's evidence." (internal quotation marks omitted)).  Importantly (given the backdrop here),

> [a]s the [Supreme] Court [has] explained, <u>the need for information in the criminal context is much weightier</u> because our historical commitment to the rule of law is nowhere more profoundly manifest than in our view that the twofold aim of criminal justice is that guilt shall not escape or innocence suffer.

<u>Cheney v. United States Dist. Ct. for Dist. of Columbia</u>, 542 U.S. 367, 384 (2004) (emphasis added) (internal brackets, ellipsis, and quotation marks omitted); <u>see also</u> <u>id.</u> (emphasizing "fundamental and comprehensive need for every man's evidence in the criminal justice system" (internal quotation marks omitted)).

It stands to reason then that "exceptions to the demand for every man's [or woman's] evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth."  <u>United States v. Nixon</u>, 418 U.S. 683, 710 (1974).  Yet, Plaintiff would have the Court construe the ADA and the Rehabilitation Act – at cross-purpose with their core objective of fully integrating disabled individuals into society – as trumping her obligation to provide evidence for a criminal investigation, as ordered by a North Carolina Superior Court Judge, because Plaintiff's use of a wheelchair may have played some part in her identification as a potential witness to the crime.  (<u>See</u> Docket Entry 20 at 39 (requesting "permanent injunction enjoining all Defendants from utilizing . . . [Plaintiff's] status as a

-80-

wheelchair user as a basis for subjecting her to highly invasive searches and seizures when she has not been accused of committing a crime").) Even worse, she wants to wield the ADA and the Rehabilitation Act as swords to strike out against those who demanded of her only what society expects of all its members: to give evidence as required by law. (See id. at 40 (requesting "[a]ward [of] damages against Defendants for violating [Plaintiff's] rights under the [ADA] and . . . the Rehabilitation Act").) The Court should decline to "allow [Plaintiff] to use the ADA [and the Rehabilitation Act] as a sword rather than [for their] intended use as a shield." Peeples v. Coastal Off. Prods., Inc., 203 F. Supp. 2d 432, 463 (D. Md. 2002), aff'd, 64 F. App'x 860 (4th Cir. 2003). "A contrary rul[ing] would convert a nondiscrimination statute into a mandatory preference statute, a result which would be [] inconsistent with the nondiscriminatory aims of the ADA [and the Rehabilitation Act] . . . ." Equal Emp. Opportunity Comm'n v. Sara Lee Corp., 237 F.3d 349, 355 (4th Cir. 2001).

Based on the foregoing analysis, the Court should allow the Tackling Sub-Claim to proceed against Defendant UNC-CH, but should dismiss the Targeting Sub-Claim.

Corum Claim under North Carolina Law against All Defendants

Finally, the SAC asserts "a direct action under the State Constitution" (Docket Entry 20 at 37), for Defendants' alleged violation of "Article I, Section 20 of the North Carolina

-81-

Constitution[, which] prohibits unreasonable searches and excessive force" (id. at 38 (internal quotation marks omitted)). According to the SAC, "Defendants violated Plaintiff's right to be free from unreasonable search and seizure under the N.C. Constitution when they seized her cellphone without probable cause and when they engaged in excessive force by knocking her from her wheelchair." (Id.) But, the SAC insists, if "the [C]ourt find[s] that Plaintiff's [federal] constitutional claims are barred by sovereign immunity, Plaintiff will not have an adequate remedy to recover for the violation of her constitutional rights" (id. at 38-39), because (the SAC posits) "[she] has no adequate remedy to recover for the violation of her constitutional rights under state law" (id. at 39). As such, the SAC contends, Plaintiff "'has a direct claim against the State under [the North Carolina] Constitution.'" (Id. (quoting Corum v. University of N.C. through Bd. of Governors, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992)).)

Defendants have solicited dismissal of Plaintiff's Corum claim on the ground, inter alia, that "adequate state law remedies exist." (Docket Entry 26 at 32; see also id. at 34-35 (developing that argument).)[24] In Defendants' view, the fact that the SAC

____

[24] Defendants also have sought dismissal of Plaintiff's Corum claim under the Eleventh Amendment. (See Docket Entry 26 at 32-34.) The North Carolina Supreme Court has made clear that sovereign immunity does not bar a Corum claim in state court. See, e.g., Craig ex rel. Craig v. New Hanover Cnty. Bd. of Educ., 363 N.C. 334, 340, 678 S.E.2d 351, 356 (2009) (explaining that Corum "clearly establish[ed] the principle that sovereign immunity could not operate to bar direct constitutional claims"); Corum, 330 N.C. at 786, 413 S.E.2d at 292 ("[W]hen there is a clash between these constitutional rights and sovereign (continued...)

-82-

"includes multiple causes of action, including some brought under North Carolina common law, . . . shows that adequate state law remedies exist" (id. at 35) and "proves that [Plaintiff] has a chance to enter the courthouse doors to argue her claims" (id.). Plaintiff disputes that assertion (see Docket Entry 29 at 26) and maintains that, "[i]f her § 1983 claims are barred" (id.), "she will be without a remedy for her clearly suffered injury, absent the allowance of her *Corum* claim to proceed" (id.).

The North Carolina Supreme Court has held that, "in the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under [the North Carolina] Constitution." Corum, 330 N.C. at 782, 413 S.E.2d at 289; see also Midgett v. North Carolina State Highway Comm'n, 260 N.C. 241, 250, 132 S.E.2d 599, 608 (1963) ("[W]here the [North Carolina] Constitution points out no remedy and no statute

_____

²⁴(...continued)
immunity, the constitutional rights must prevail."). Federal courts, however, have differed in their treatment of defenses under the Eleventh Amendment to a Corum claim. Compare Zow v. Board of Governors of Univ. of N.C., No. 5:23CV290, 2024 WL 1601205, at *7 (E.D.N.C. Feb. 12, 2024) (unpublished) (concluding that Eleventh Amendment barred state constitutional claims), recommendation adopted in part, modified in part, 2024 WL 1285532 (E.D.N.C. Mar. 26, 2024) (unpublished), aff'd, No. 24-1498, 2024 WL 5199614 (4th Cir. Dec. 23, 2024) (unpublished), with ACLU of N.C. v. Stein, No. 1:23CV302, 2024 WL 3203185, at *9 (M.D.N.C. June 26, 2024) (unpublished) (Biggs, J.) (agreeing with "argu[ment] that [] state constitutional claims survive because the decision of the North Carolina Supreme Court in [Corum] waived Eleventh Amendment sovereign immunity for such claims"). The Court need not resolve this issue, as the existence of an adequate state remedy (as discussed above) precludes any Corum claim. See, e.g., Guseh v. North Carolina Cent. Univ. ex rel. Bd. of Governors of Univ. of N.C., 206 F. App'x 255, 255, 256 n.* (4th Cir. 2006) (affirming district court decision for reasons stated therein and explaining that "district court accepted the magistrate judge's recommendation with one exception: . . . that [the] claim under the North Carolina Constitution was not barred by sovereign immunity, but rather, was barred because such direct constitutional claims may only proceed in the absence of an alternative state remedy" (internal citation omitted)).

affords an adequate remedy under a particular fact situation, the common law will furnish the appropriate action for adequate redress of such grievance."), overruled in nonrelevant part by Lea Co. v. North Carolina Bd. of Transp., 308 N.C. 603, 615-16, 304 S.E.2d 164, 173-74 (1983). Here, the SAC asserts a claim for unlawful search and seizure and excessive force in violation of the North Carolina Constitution. (See Docket Entry 20 at 38.) That claim fails as a matter of law because "the issue of whether there is a direct cause of action under *Corum* for such . . . claim[s] has already been decided against [Plaintiff]." Rousselo v. Starling, 128 N.C. App. 439, 447, 495 S.E.2d 725, 730-31 (1998).

More specifically, North Carolina courts have held that "the common law action for trespass to chattel provides a remedy for an unlawful search." Id. at 448, 495 S.E.2d at 731 (citing McDowell v. Davis, 33 N.C. App. 529, 534-35, 235 S.E.2d 896, 900, appeal dismissed and disc. review denied, 293 N.C. 360, 237 S.E.2d 848 (1977), overruled on other grounds, Johnson v. Ruark Obstetrics, 327 N.C. 283, 395 S.E.2d 85 (1990)); see also id. at 449, 495 S.E.2d at 732 ("As the common law remedy of trespass to chattel provides an adequate vindication of the right to freedom from unreasonable searches, we hold that the trial court did not err in granting summary judgment to [the defendant] on [the plaintiff's constitutional] claim."). Trespass to chattel also provides an adequate remedy for the alleged unlawful seizure of Plaintiff's

-84-

cellular telephone.  See McDowell, 33 N.C. App. at 535, 235 S.E.2d at 900 ("The common law analogues for [the] plaintiffs' present § 1983 suit are actions for the intentional torts of trespass to land and chattels. . . .  To be liable for trespass to chattel, [a person] need only intentionally dispossess the chattel of another or intermeddle with the chattel of another, when not privileged or authorized to do so." (emphasis added)).  In turn, "a civil action for damages for assault and battery is available at common law against one who, for the accomplishment of a legitimate purpose, such as justifiable arrest, uses force which is excessive under the given circumstances."  Myrick, 91 N.C. App. at 215, 371 S.E.2d at 496.  Accordingly, an assault and battery claim "serve[s] to protect the same constitutional rights to be free from . . . excessive force [that Plaintiff] seeks to vindicate with h[er] alternative direct constitutional claim."  Edwards v. City of Concord, 827 F. Supp. 2d 517, 524 (M.D.N.C. 2011) (Schroeder, J.).

Because North Carolina law provides adequate remedies for Plaintiff's alleged state constitutional violations, the Court should dismiss her Corum claim.  See, e.g., Barnett v. Karpinos, 119 N.C. App. 719, 724, 728, 460 S.E.2d 208, 210, 213 (1995) ("hold[ing] that [the] plaintiffs' constitutional rights are adequately protected by their common law tort claims, and that a direct cause of action is not warranted," where suit "alleged officers used unreasonable and excessive force in executing [a]

-85-

search warrant, and . . . detained [the plaintiffs] without a valid warrant, probable cause, or reasonable suspicion, all in violation of the right to be free from unreasonable search and seizure").

<u>CONCLUSION</u>

The SAC (A) states a federal constitutional claim against Defendant Humphrey in his individual capacity for obtaining an overbroad search warrant, (B) states both a federal constitutional claim and two state common law claims against Individual Defendants in their individual capacities for using excessive force when they served the search warrant, and (C) may state a failure-to-accommodate claim against Defendant UNC-CH under two federal, disability-related statutes (regarding service of the search warrant), but (D) all the other claims (or sub-claims) against Defendants in the SAC fail as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Dismissal Motion (Docket Entry 25) be granted in part and denied in part, in that the Court should dismiss all the SAC's claims against all Defendants, except:

1) Plaintiff's Section 1983 claim for damages against Defendant Humphrey in his individual capacity for obtaining an overbroad search warrant in violation of the Fourth Amendment;

2) Plaintiff's Section 1983 claim(s) for damages against Individual Defendants in their individual capacities for using excessive force during the service of the search warrant in violation of the Fourth Amendment;

-86-

3) Plaintiff's North Carolina common law claims for damages against Individual Defendants in their individual capacities for battery and negligent infliction of emotional distress during the service of the search warrant; and

4) Plaintiff's ADA and Rehabilitation Act claims against Defendant UNC-CH for failing to reasonably accommodate her disability during the service of the search warrant (i.e., the Tackling Sub-Claim).

/s/ L. Patrick Auld

**L. Patrick Auld**
**United States Magistrate Judge**

March 13, 2026